<u>In Re: M. P.</u>, No. 3, September Term, 2023

**COLLATERAL ORDER DOCTRINE – MOTION TO DISMISS – JURISDICTION OF JUVENILE COURT –** Supreme Court of Maryland held that juvenile court's denial of motion of M.P., Appellant, to dismiss for lack of juvenile court jurisdiction was immediately appealable under collateral order doctrine.

Supreme Court further held that juvenile court does not have jurisdiction over child in delinquency proceeding where child was 10 to 12 years old at time of alleged delinquent act and petition for juvenile delinquency was filed against child, charging child with act that, if committed by adult, would not be crime of violence as specified in Md. Code Ann., Crim. Law (2002, 2021 Repl. Vol., 2022 Supp.) § 14-101, and petition was pending adjudication of delinquency in juvenile court as of effective date of Juvenile Justice Reform Act ("JJRA"), as part of which General Assembly amended Md. Code Ann., Cts. & Jud. Proc. (2006, 2020 Repl. Vol., 2022 Supp.) § 3-8A-03. Supreme Court concluded that JJRA's change to juvenile court jurisdiction applies to cases pending adjudication of delinquency when law took effect, and, as such, juvenile court erred in denying M.P.'s motion to dismiss.

Circuit Court for Prince George's County
Case No. JA-22-0183

Argued: September 8, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 3

September Term, 2023

_____

IN RE: M. P.

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Opinion by Watts, J.
Biran and Gould, JJ., dissent.

_____

Filed: April 23, 2024

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*Hotten, J., participated in the hearing of the case, in the conference in regard to its decision, and in the adoption of the opinion as an active judge. She retired from the Court and was recalled to senior status prior to the filing of the opinion.

In this case, we are asked to determine whether a legislative change to the jurisdiction of juvenile courts, removing children under the age of 13, except under limited circumstances, from a juvenile court's jurisdiction in delinquency proceedings, applies to delinquency proceedings that were pending at the time of the law taking effect and therefore requires dismissal of the proceedings. Before reaching this question, we must assess whether the interlocutory appeal that brought the case to us is permitted.

The law in question, Md. Code Ann., Cts. & Jud. Proc. (2006, 2020 Repl. Vol., 2022 Supp.) ("CJ") § 3-8A-03, which the General Assembly amended as part of the Juvenile Justice Reform Act ("the JJRA"), see 2022 Md. Laws ___ (Vol. ___, Ch. 41, S.B. 691); 2022 Md. Laws ___ (Vol. ___, Ch. 42, H.B. 459), removed from the juvenile courts' jurisdiction juvenile delinquency proceedings against children under 13 years of age, with the exception of those aged 10 to 12 years old charged with committing an act that would be considered a crime of violence if committed by an adult. See CJ § 3-8A-03(a)(1), (d)(7). The General Assembly enacted this change in juvenile delinquency law upon the recommendation of the Maryland Juvenile Justice Reform Council ("the JJRC"), which determined, among other things, that young children are harmed by involvement in the juvenile delinquency system, with evidence increasingly demonstrating that young children have limited ability to appreciate their culpability for delinquent acts or to understand delinquency proceedings. See JJRC, Final Report at 6, 17 (Jan. 2021), available at http://dls.maryland.gov/pubs/prod/NoPblTabMtg/CmsnJuvRefCncl/JJRC-Final-Report. pdf [https://perma.cc/4DS9-T5PH].

The jurisdictional change took effect on June 1, 2022, after the child in this case,

M.P., Appellant, had been charged in a delinquency petition in juvenile court with the theft of a motor vehicle and related acts that were alleged to have occurred when he was 12 years old.[1]  On June 30, 2022, before the juvenile court held an adjudicatory hearing on the petition, M.P. filed a motion to dismiss the petition for lack of jurisdiction, contending that the change in law divested the juvenile court of jurisdiction over him.  The State, Appellee, opposed the motion.  On August 8, 2022, the juvenile court denied the motion, concluding that it had jurisdiction over M.P. based on the delinquency petition having been filed before June 1, 2022, the effective date of the JJRA.  M.P. noted an interlocutory appeal to the Appellate Court of Maryland and filed in the juvenile court a motion to stay proceedings pending appeal, which was granted.  Before the Appellate Court resolved the appeal, M.P. petitioned this Court for a writ of *certiorari*.  In an answer to the petition, the State contended that the juvenile court's denial of M.P.'s motion to dismiss for lack of jurisdiction is an interlocutory ruling that is not immediately appealable, and that M.P.'s petition should be denied.

We granted the petition to resolve two questions: whether M.P.'s interlocutory appeal is permitted under the collateral order doctrine, and whether the juvenile court was correct in ruling that it maintained jurisdiction over M.P., a child charged with non-violent acts allegedly committed when he was 12 years old, before the effective date of the JJRA. On September 8, 2023, after oral argument in the case, we issued an order denying a motion

---

[1]In the delinquency petition, M.P. was charged with theft of a motor vehicle, unauthorized removal of property, "rogue and vagabond," theft of property having a value of at least $1,500 but less than $25,000, and driving without a license.

by the State to dismiss M.P.'s appeal, concluding that under the common law collateral order doctrine, an immediate appeal of the August 8, 2022 ruling of the juvenile court denying M.P.'s motion to dismiss for lack of jurisdiction is permitted. In the same order, we reversed the juvenile court's denial of M.P.'s motion to dismiss for lack of jurisdiction. See In Re: M. P., 486 Md. 92, 93-94, 301 A.3d 1254, 1254-55 (2023) (per curiam). We now explain the basis for that order.

In this Court, the parties disagree only as to whether an interlocutory appeal is allowed. M.P. contends that his interlocutory appeal is permitted under the collateral order doctrine as an exception to the general requirement that an appeal lies only from a final judgment. The State responds that the collateral order doctrine does not apply and includes in its brief a motion to dismiss the appeal. The parties agree, however, that, should this Court determine that M.P.'s appeal is not permitted under the collateral order doctrine, the Court may exercise its discretion to address the merits to provide guidance to juvenile courts about jurisdiction in this case and others like it.

As to the merits, the parties agree that the juvenile court erred in denying M.P.'s motion to dismiss. The parties agree that, under this Court's case law, as a result of the jurisdictional change brought about by the JJRA, the juvenile court does not have jurisdiction over M.P. because he was charged with committing non-violent acts when he was 12 years old and the case was pending in the juvenile court at the time that the JJRA became effective. M.P. and the State agree that applying the jurisdictional change from the JJRA to a delinquency case that was pending, but not final, on June 1, 2022, does not involve a determination as to whether the change applies retroactively, but rather rests on

the prospective application of a change in juvenile law, making the new law applicable to this case and others in a similar procedural posture.

In the petition for a writ of *certiorari*, as the second of two questions, M.P. asked this Court to determine whether an order denying a motion to dismiss for lack of juvenile court jurisdiction is immediately appealable. Because challenges to jurisdiction in juvenile matters may occur for a variety of reasons, we rephrase M.P.'s question as follows: whether a juvenile court's denial of a motion to dismiss for lack of jurisdiction is immediately appealable under the collateral order doctrine where the court determined that it maintained jurisdiction over a child who was 12 years old at the time he allegedly committed a non-violent delinquent act,[2] because the petition for juvenile delinquency was filed before the effective date of the JJRA. We answer the question "yes" and conclude that M.P.'s appeal is permitted under the collateral order doctrine.

Addressing the merits, we agree with M.P. and the State that the juvenile court erred in denying M.P.'s motion to dismiss. We hold that a juvenile court does not have jurisdiction over a child who was 10 to 12 years old at the time of an alleged delinquent act and charged in a petition for juvenile delinquency with the commission of an act that, if committed by an adult, is not a crime of violence as specified in Md. Code Ann., Crim. Law (2002, 2021 Repl. Vol., 2022 Supp.) ("CR") § 14-101, where the petition was pending

---

[2]"Delinquent act" is defined as an act that "would be a crime if committed by an adult." CJ § 3-8A-01(l).

adjudication of delinquency[3] in the juvenile court as of the effective date of the JJRA.  See CJ § 3-8A-03(a)(1), (d)(7).

Given that the petition charging M.P. with delinquent acts was pending adjudication at the time that the JJRA took effect and there is no dispute about M.P.'s age at the time of the alleged acts (he was 12 years old) or that he was charged with conduct that, if committed by an adult, would not have constituted a crime of violence under CR § 14-101, based on the plain language of the JJRA, its legislative history, and our case law, the juvenile court erred in denying M.P.'s motion to dismiss.  Therefore, in this and any other case in which a juvenile delinquency petition is pending on or after June 1, 2022, in which there is no genuine factual dispute concerning the juvenile's age or whether the juvenile was charged with having committed an act that would not be a crime of violence if committed by an adult, the juvenile court no longer has jurisdiction over the juvenile and must dismiss the case.

---

[3]If the juvenile court determines at an adjudicatory hearing that a child committed the delinquent act alleged in the petition, CJ § 3-8A-19(b)(1) requires the juvenile court to hold a separate disposition hearing, unless the hearing is waived in writing by all of the parties.  CJ § 3-8A-01(p) defines a "disposition hearing" as "a hearing under th[e] subtitle to determine: (1) Whether a child needs or requires guidance, treatment, or rehabilitation; and, if so (2) The nature of the guidance, treatment, or rehabilitation."  (Paragraph breaks omitted).  CJ § 3-8A-01(m) defines a "delinquent child" as "a child who has committed a delinquent act and requires guidance, treatment, or rehabilitation."  In In re Herbert B., 303 Md. 419, 424, 494 A.2d 680, 682 (1985), we stated that a fair reading of the relevant statutes demonstrates "that a child can be classified as a 'delinquent child' only after the court at the adjudicatory hearing finds that the child has committed a delinquent act and the court at the disposition hearing determines that the child is in need of the court's assistance, guidance, treatment, or rehabilitation."  (Citation omitted).  In other words, for a child to be adjudicated a "delinquent child," there must be both an adjudicatory hearing and a disposition hearing.

**BACKGROUND**

On April 9, 2022, the General Assembly enacted the JJRA, with an effective date of June 1, 2022. See 2022 Md. Laws ___ (Vol. ___, Ch. 41, S.B. 691); 2022 Md. Laws ___ (Vol. ___, Ch. 42, H.B. 459). Among other changes, this legislation established, for the first time, a minimum age restriction on the jurisdiction of juvenile courts with regard to children alleged to be delinquent. See CJ § 3-8A-03(a)(1), (d)(7). Whereas, previously, the juvenile court had "exclusive original jurisdiction over[ a] child who is alleged to be delinquent[,]" Md. Code Ann., Cts. & Jud. Proc. (2006, 2020 Repl. Vol., 2021 Supp.) ("CJ (2021)") § 3-8A-03(a)(1), and there was no minimum age limitation, the JJRA restricted a juvenile court's jurisdiction in delinquency proceedings to children "[w]ho [are] at least 13 years old [and] alleged to be delinquent" or "at least 10 years old [and] alleged to have committed an act[ t]hat, if committed by an adult, would constitute a crime of violence, as defined in" CR § 14-101, or "[a]rising out of the same incident as" such an act, CJ § 3-8A-03(a)(1), (d)(7).[4] The JJRA also added CJ § 3-8A-03(f), which provides that "[a] child under the age of 13 years may not be charged with a crime."

On May 5, 2022, prior to the effective date of the JJRA, the State filed a juvenile petition in the Circuit Court for Prince George's County, sitting as a juvenile court, alleging that on March 12, 2022, M.P. committed motor vehicle theft and related delinquent acts. M.P. was 12 years old on the date of the alleged acts. On June 30, 2022, prior to the juvenile court's adjudication of the petition, counsel for M.P. filed a motion to dismiss for

---

[4]Both CJ (2021) § 3-8A-01(d) and CJ § 3-8A-01(d) provide that "child" "means an individual under the age of 18 years." 2005 Md. Laws 3303 (Vol. V, Ch. 580, H.B. 802).

lack of jurisdiction because the JJRA had taken effect on June 1, 2022. The State opposed the motion. On August 8, 2022, the juvenile court held a hearing on the motion and denied it, ruling that the JJRA did not deprive the court of jurisdiction that had been established over M.P. at the time of the filing of the delinquency petition. The court stated that "the clear language of the statute[] does not appear to apply retroactively to any claims that arose prior to June 1st, 2022."

On August 12, 2022, M.P. noted an appeal to the Appellate Court of Maryland. The same day, M.P. filed in the juvenile court a motion to stay proceedings pending the appeal, which the court granted on August 15, 2022.

### Petition for a Writ of *Certiorari*

On November 23, 2022, before the State filed a brief in the Appellate Court, M.P. filed in this Court a petition for a writ of *certiorari*, raising two issues: whether the juvenile court retained jurisdiction over M.P. after the effective date of the JJRA, and whether a juvenile court's denial of a motion to dismiss for lack of jurisdiction is immediately appealable.[5] In an answer to M.P.'s petition, although contending that the denial of the motion to dismiss for lack of jurisdiction was not immediately appealable, the State advised

---

[5]In the petition for a writ of *certiorari*, M.P. raised the following two questions:

1. As an issue of first impression, does the newly enacted statute which establishes a minimum age of jurisdiction for the juvenile court apply to cases pending at the time of the statute's enactment?

2. As an issue of first impression, is an order denying a motion to dismiss for lack of juvenile court jurisdiction immediately appealable under the collateral order doctrine?

- 7 -

that, if this Court disagreed or concluded that the appealability issue merited review, the State did not oppose the granting of the petition to consider M.P.'s question concerning the applicability of the JJRA. The State filed a motion to stay proceedings in the Appellate Court as this Court was considering M.P.'s petition for a writ of *certiorari,* and the Appellate Court granted the motion. On March 24, 2023, we granted M.P.'s petition. See In Re: M. P., 483 Md. 269, 291 A.3d 779 (2023).

## DISCUSSION[6]

### I. Appealability

### A. The Parties' Contentions

In its brief, the State brings a motion to dismiss the appeal, contending that the juvenile court's denial of M.P.'s motion to dismiss is not immediately appealable under the collateral order doctrine. According to the State, M.P.'s appeal is not permitted under the collateral order doctrine because it fails to meet the requirement that the denial of the motion to dismiss "would be effectively unreviewable if the appeal had to await the entry of a final judgment."

The State likens M.P.'s contention that the denial of his motion to dismiss is immediately appealable to that of the appellant in In re Franklin P., 366 Md. 306, 313-14, 783 A.2d 673, 677-78 (2001), a case in which a juvenile court issued an order purporting to rescind its waiver of jurisdiction to the criminal court and the juvenile defendant unsuccessfully sought, under the collateral order doctrine, an immediate appeal of the

---

[6]We will address in reverse order the two questions presented in the petition, one of which we have rephrased.

criminal court's denial of a motion to dismiss for lack of jurisdiction. The State contends that, as in Franklin P., id. at 327-28, 783 A.2d at 686, M.P.'s argument concerning a lack of jurisdiction would be fully reviewable on appeal after final judgment. The State argues that such an outcome aligns with this Court's case law holding that an unsuccessful challenge to subject matter jurisdiction is not immediately appealable and that an opposite conclusion would be contrary to the goal of the final judgment rule to avoid piecemeal appeals that reduce the efficiency of courts.

The State also asserts that there is no basis for M.P.'s contention that he has the right to an immediate appeal under the collateral order doctrine because he has a right to not be subject to delinquency proceedings in the same way that a criminal defendant has a right to not be tried twice for the same offense under the Fifth Amendment prohibition against double jeopardy. The State maintains that this Court has already rejected comparisons between the denial of a motion to dismiss for lack of jurisdiction based on a violation of the double jeopardy right, which is immediately appealable, and other claims that the denial of a motion to dismiss is immediately appealable under the collateral order doctrine. Finally, although the State contends that the appeal should be dismissed, the State advises that "this case presents one of the rare times this Court's guidance on the merits may be warranted" because "the merits issue is an uncontested matter of statutory interpretation and [] there is a need for guidance in the lower courts[.]"

M.P. responds that the juvenile court's denial of his motion to dismiss for lack of jurisdiction is immediately appealable under the collateral order doctrine because the denial of the motion to dismiss meets all four elements that this Court has established as necessary

for the collateral order doctrine to apply, as the denial "(1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, and (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment." (Quoting Stephens v. State, 420 Md. 495, 502, 24 A.3d 105, 109 (2011) (cleaned up)). M.P. argues that the second and fourth elements—the importance of the issue and reviewability after final judgment—are satisfied because the General Assembly concluded that preventing harm to children under age 13 from exposure to the juvenile delinquency system was so important that it merited generally excluding children under the age of 13 from the jurisdiction of the juvenile court. M.P. asserts that requiring him to proceed to a final judgment before an appeal would cause him to incur the exact harm (involvement in juvenile court) that the General Assembly sought to prevent with the enactment of the JJRA and deprive him of the right to not be involved in delinquency proceedings.

M.P. analogizes the circuit court's denial of his motion to dismiss for lack of jurisdiction "to the denial of a motion to dismiss pursuant to the double jeopardy clause" by a criminal defendant, which is immediately appealable under the collateral order doctrine. Quoting Richardson v. United States, 468 U.S. 317, 320 (1984), M.P. maintains that, like a defendant's appeal of the denial of motion to dismiss based on a claim of double jeopardy, his appeal "contest[s] the very power of the Government to bring a person to trial, and that right would be significantly impaired if review were deferred until after trial." (Alteration in original). Finally, like the State, M.P. advises that, if this Court concludes that the denial of the motion to dismiss is not immediately appealable, we should

nonetheless address the merits.

## B. Statutory Construction

"Our goal in statutory construction is to determine legislative intent[,]" starting "with the plain meaning of the statutory language in question." State v. Krikstan, 483 Md. 43, 65, 290 A.3d 974, 987 (2023) (citations omitted). We begin with the normal meaning of the text "because we presume that the General Assembly meant what it said and said what it meant." Id. at 65, 290 A.3d at 987 (cleaned up). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." Id. at 65, 290 A.3d at 987 (cleaned up). This typically ends our analysis without resort to other rules of construction or sources outside of the statute itself, although the plain language of a statute "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." Comptroller of Md. v. FC-GEN Operations Invs. LLC, 482 Md. 343, 379-80, 287 A.3d 271, 292-93 (2022) (citation omitted).

## C. Relevant Case Law: Interlocutory Appeals

Generally, a party has a right to appeal only "from a final judgment entered in a civil or criminal case by a circuit court." CJ § 12-301. "The primary rationale is to prevent piecemeal appeals and to prevent the interruption of ongoing judicial proceedings[,]" in order "to promote judicial efficiency and economy." Sigma Reprod. Health Ctr. v. State, 297 Md. 660, 665, 467 A.2d 483, 485 (1983) (citations omitted). Exceptions to this general rule exist, however, including "appeals from interlocutory rulings allowed under the

common law collateral order doctrine." In re O.P., 470 Md. 225, 250, 235 A.3d 40, 55 (2020) (citing Salvagno v. Frew, 388 Md. 605, 615, 881 A.2d 660, 666 (2005)). We have described the collateral order doctrine as "very limited," and applying to "only a narrow class of orders that are offshoots of the principal litigation in which they are issued[.]" Stephens, 420 Md. at 502, 24 A.3d at 109 (cleaned up).

Under the collateral order doctrine, an order is immediately appealable if it "(1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, and (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment." Id. at 502, 24 A.3d at 109 (cleaned up). To qualify for immediate appealability under the collateral order doctrine, an order must meet all four elements. See id. at 502-03, 24 A.3d at 109. We apply these elements "very strictly" in keeping with the narrow nature of the exception, which should apply "only in extraordinary circumstances." Id. at 503, 24 A.3d at 109 (cleaned up).

It is well settled that an immediate appeal of the denial of a motion to dismiss on the ground that the prosecution violates a defendant's double jeopardy rights is permitted under the collateral order doctrine. See id. at 505 n.4, 24 A.3d at 111 n.4. In Stephens, id. at 505, 24 A.3d at 111, we explained that the right to an immediate appeal from the denial of a motion to dismiss that alleged a double jeopardy violation is based on "the serious risk of irreparable loss of the claimed right if appellate review is deferred until after final judgment." (Cleaned up). We observed that the Supreme Court of the United States had explained

that a ruling denying a claimed violation of the Double Jeopardy Clause comes within the collateral order doctrine because the ruling constitutes a final rejection of the claim, the issue is entirely collateral to and separable from the issue of guilt or innocence, and most significantly, delay in appellate review until after a final judgment would undermine the very right accorded by the double jeopardy prohibition, that is, the "guarantee against being twice put to *trial* for the same offense."

Id. at 505 n.4, 24 A.3d at 111 n.4 (quoting Abney v. United States, 431 U.S. 651, 661 (1977)) (emphasis in original).

In Stephens, we concluded that such was not the case, though, with the right afforded by the statute at issue, which forbade the imposition of the death penalty without the State having first presented to the jury or court biological or DNA evidence linking a defendant to a murder; we determined that right, "akin to the right to a speedy trial, must await appellate review following final judgment." Id. at 498, 506, 24 A.3d at 106-07, 111. We stated that "[o]nly in the rarest of circumstances do we indulge a contention that an asserted right includes the right to avoid trial altogether, such that it would be effectively unreviewable on appeal from final judgment." Id. at 507, 24 A.3d at 112.

Similarly, in Bunting v. State, 312 Md. 472, 474-75, 482, 540 A.2d 805, 806, 809 (1988), where the defendant in a criminal case contended that dismissal was warranted due to a violation of the interstate detainer statute, we concluded that the collateral order doctrine did not permit an immediate appeal of the denial of the defendant's motion to dismiss. The defendant likened his situation to that of a defendant seeking dismissal of charges as violative of the right against double jeopardy and contended that he had a right to not stand trial, making the collateral order doctrine applicable. See id. at 477-78, 540 A.2d at 807. We disagreed because the interstate detainer statute did not create a right to

be free of trial, but instead guarded against certain transfer procedures before trial. See id. at 478-79, 540 A.2d at 807-08.

In Bunting, id. at 479-80, 540 A.2d at 808, we described a general problem that could have arisen from a holding to the contrary by observing "that numerous 'rights' can readily be characterized as entitling a party to avoid trial under some circumstances." We identified the denial of a motion for summary judgment or a motion to dismiss based on a statute of limitations as situations that could potentially be described as a right to avoid trial absent some prerequisite, and that permitting the collateral order doctrine to apply in those instances would permit the doctrine to "largely erode the final judgment rule." Id. at 480, 540 A.2d at 808. We explained that it was "important that we narrowly construe the notion of an entitlement not to be sued or prosecuted." Id. at 480, 540 A.2d at 808. We stated: "In sum, the idea that an issue is not effectively reviewable after the termination of the trial because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims and a very few other extraordinary situations." Id. at 481-82, 540 A.2d at 809. Otherwise, "there would be a proliferation of appeals under the collateral order doctrine[,]" which "would be flatly inconsistent with the long-established and sound public policy against piecemeal appeals." Id. at 482, 540 A.2d at 809 (footnote omitted).

In Parrott v. State, 301 Md. 411, 413, 425, 483 A.2d 68, 69, 75 (1984), another case involving a capital murder prosecution, we concluded that the grant or denial of a motion to remove a case to another jurisdiction under Md. Const., Art. IV, § 8 was not within "the narrow class of cases excepted from the final judgment requirement" under the collateral order doctrine. We stated:

- 14 -

Fundamentally, Parrott's point that his prosecution should not have been removed from Prince George's County (or, if removed, should have been sent to a county of like demographics) will not be lost if there is a final judgment against Parrott and the point is made on appeal from that judgment. . . . Any right which Parrott asserts in opposition to the State's suggestion of removal necessarily deals with the place of trial. But Parrott asserts no right which could prevent the trial itself.

Id. at 425-26, 483 A.2d at 75. We explained that, under the collateral order doctrine, a defendant may appeal immediately following the denial of a motion to dismiss on the ground of double jeopardy because implicit in the prohibition against double jeopardy is a right to be free from a second trial, and "[t]hat aspect of the right can never be restored by reversing a conviction after the second trial on the grounds that the second trial violated double jeopardy principles." Id. at 425, 483 A.2d at 75.

In Franklin P., 366 Md. at 313-14, 783 A.2d at 677-78, we determined that the collateral order doctrine did not allow an immediate appeal from a criminal court's denial of a juvenile defendant's motion to dismiss for lack of jurisdiction. The juvenile defendant faced adult criminal charges as a result of the juvenile court having granted the State's motion for waiver of jurisdiction. See id. at 311-12, 783 A.2d at 676-77. Later, when the juvenile court granted a request for reconsideration and purported to rescind its decision to waive jurisdiction, the defendant brought a motion to dismiss the charges in criminal court for lack of jurisdiction, which the circuit court (*i.e.*, the criminal court) denied. See id. at 312-13, 783 A.2d at 677. We determined that the denial of the motion to dismiss did not qualify for immediate appeal under the collateral order doctrine because the denial of the motion would be fully reviewable on appeal after final judgment. See id. at 327-28, 783 A.2d at 686.

- 15 -

In discussing the rationale for not permitting interlocutory appeals of orders waiving juvenile court jurisdiction, we explained that the General Assembly had made clear that "[a]ppeals of waiver decisions are interlocutory[,] intended to be resolved after the conclusion of the proceedings in the criminal court trial[,]" and "not intended to be made before a final decision in the criminal courts[.]" Id. at 325, 783 A.2d at 684.[7] We stated that the criminal court's denial of the motion to dismiss was "completely reviewable on appeal[,]" as the General Assembly had provided. Id. at 328, 783 A.2d at 686. We noted that, "were we to hold that waiver orders are immediately appealable under the collateral order doctrine (or otherwise) numerous (perhaps [in]numerable) criminal proceedings would be stayed, while juvenile waivers are first litigated at the appellate level." Id. at 328, 783 A.2d at 686 (footnote omitted). In addition, we pointed out that once the juvenile court waived its jurisdiction, the court no longer had the authority, *i.e.*, the jurisdiction, to address the defendant's motion for reconsideration and rescind the order waiving jurisdiction. See id. at 335, 783 A.2d at 690. Despite ordering the appeal to be dismissed, though, we addressed the merits of the case "for guidance purposes, and because of the importance of the questions and the probability that, since the question has now arisen, it might arise with some frequency in the future[.]" Id. at 314, 783 A.2d at 678.

Recently, in O.P., 470 Md. at 232-33, 235 A.3d at 44-45, we determined that the collateral order doctrine allowed the immediate appeal of an order denying continued

---

[7]We pointed out that the relevant statute did not provide a right to an immediate appeal because the General Assembly had amended it to identify a waiver of jurisdiction as interlocutory rather than immediately appealable, as a previous version of the statute had stated. See Franklin P., 366 Md. at 323, 325, 783 A.2d at 683-84.

emergency shelter care in a child in need of assistance ("CINA") proceeding. Because "shelter care is by definition temporary during the pendency of a CINA proceeding and intended to deal with a serious risk to the child's safety and welfare during that period[,]" we concluded that an order "denying continued shelter care would be effectively unreviewable if an appeal had to await a final judgment in [a] CINA case." Id. at 251-52, 235 A.3d at 56. We agreed with the Appellate Court of Maryland that the closest question concerning the elements of the collateral order doctrine was whether the denial of emergency shelter care was separate from the merits of the action, and concluded that it was separate because the placement issue was "neither a necessary step in a CINA proceeding nor [] part of the CINA determination." Id. at 252, 235 A.3d at 56 (citation omitted).

### D. M.P.'s Interlocutory Appeal

In this case, after careful review of the authorities above, we conclude that the juvenile court's denial of M.P.'s motion to dismiss for lack of jurisdiction falls within the "narrow class of cases excepted from the final judgment requirement" and presents one of the rare circumstances in which an immediate appeal of an interlocutory order is permitted by the collateral order doctrine. Parrott, 301 Md. at 425, 483 A.2d at 75. The first two elements of the collateral order doctrine are clearly met: the denial of the motion to dismiss fully resolved the jurisdictional question and the question at issue is one of great importance, as it concerns whether the juvenile court has properly exercised jurisdiction over M.P., when, under the JJRA, the juvenile court would not have jurisdiction over M.P., given his age and the acts that he is alleged to have committed. The issue is also of great

- 17 -

importance because it concerns the jurisdiction of the juvenile court over other children who are similar to M.P., *i.e.*, charged in a delinquency petition when under the age of 13 at the time of the alleged act, where the act would not constitute a crime of violence, and delinquency proceedings were pending at the time the JJRA became effective. The third element is met, as the ruling on M.P.'s motion to dismiss was collateral to, and separate from, the merits of the delinquency case against him. Unlike rulings on the waiver of juvenile court jurisdiction, which depend in part on an assessment of the nature of the offense, the juvenile court's resolution of M.P.'s motion to dismiss did not require any consideration of underlying facts that would bear on whether M.P. committed the acts in question.

The fourth element—whether the issue would be effectively unreviewable if the appeal had to await entry of a final judgment—is where the controversy exists. Because M.P. phrased the question broadly to be whether a motion to dismiss for lack of jurisdiction in juvenile court is immediately appealable, we have narrowed the question to focus on whether a juvenile court's denial of a motion to dismiss for lack of jurisdiction is immediately appealable where the juvenile court determined that it maintained jurisdiction over a 12-year-old, after the effective date of the JJRA, in a pending case that did not involve an act that, if committed by an adult, would constitute a crime of violence. We conclude that the denial of the motion to dismiss in question is effectively not reviewable after final judgment and embodies a decision affecting the well-being of a juvenile that is unlike other determinations with respect to jurisdiction that we have held not to be immediately appealable.

To reject M.P.'s argument that a juvenile's court's lack of jurisdiction under CJ § 3-8A-03 over a child under the age of 13 implies a right for the child to not be subject to delinquency proceedings would be to ignore the plain language and legislative history of the JJRA, as well as our case law. CJ § 3-8A-03(a)(1) provides that, in addition to the jurisdiction of a juvenile court concerning CINA cases, the juvenile court has exclusive original jurisdiction over a child:

(i) Who is at least 13 years old alleged to be delinquent; or

(ii) Except as provided in subsection (d) of this section, who is at least 10 years old alleged to have committed an act:

1. That, if committed by an adult, would constitute a crime of violence, as defined in § 14-101 of the Criminal Law Article; or

2. Arising out of the same incident as an act listed in item 1 of this item[.]

CJ § 3-8A-03(d)(7) provides that the juvenile court "does not have jurisdiction over[,]" "[e]xcept as provided in subsection (a)(1)(ii) of this section, a delinquency proceeding against a child who is under the age of 13 years."

In amending CJ § 3-8A-03, the General Assembly, based on extensive study, purposefully "limit[ed] the circumstances under which a child younger than age 13 is subject to the jurisdiction of the juvenile court[.]" S.B. 691 (2022), Revised Fiscal and Policy Note at 1 (Mar. 24, 2022), available at https://mgaleg.maryland.gov/2022RS/fnotes/ bil_0001/sb0691.pdf [https://perma.cc/6LJA-BQRX]. The Revised Fiscal and Policy Note demonstrates that Senate Bill 691 (2022) generally implemented recommendations of the JJRC, which was created pursuant to Chapters 252 and 253 of the session laws of 2019 to

- 19 -

study the handling of children in the juvenile and criminal justice systems and which issued its final report in January 2021 and a supplemental report in October 2021. See id. at 9. In its final report, the JJRC explained that, with the assistance of the Vera Institute of Justice, it had researched "best practices regarding the treatment of juveniles who are subject to the criminal and juvenile justice systems and identif[ied] recommendations to limit or otherwise mitigate risk factors that contribute to juvenile contact with the criminal and juvenile justice systems." JJRC, Final Report at 6.

In a section of the final report concerning policy, the JJRC stated that "[a] growing body of evidence has found that pre-teens have diminished neurocognitive capacity to be held culpable for their actions" and that they similarly "have little ability to understand delinquency charges against them, their rights and role in an adversarial system, and the role of adults in th[e] system." Id. at 17 (footnote omitted). The JJRC reported that, "[r]ecognizing this developmental science, as well as recognizing the damage inflicted by putting relatively young children into the juvenile justice system, several states have recently moved to create a minimum age of juvenile court jurisdiction." Id.[8] As such, the

---

[8]In its final report, the JJRC included a link to a report dated September 3, 2020, which indicated that several States had created a minimum age for juvenile court jurisdiction. See JJRC, National Practice for Raising the Age of Juvenile Court Jurisdiction (Sept. 3, 2020), available at http://dls.maryland.gov/pubs/prod/NoPblTabMtg/ CmsnJuvRefCncl/NATIONAL_CONTEXT_Under13_Presentation_VeraFormat.pdf [https://perma.cc/49JC-YHR5]. In that report, the reasons for creating a minimum age included the "[h]armful effects of [the] juvenile justice experience: To children with many adverse childhood experiences, [the] experience of the juvenile system is damaging, [and] leads to poor outcomes." Id. at 4. Another reason was "[l]egal competence: Children have diminished ability to understand the charges against them, their rights, their role in an adversarial system, and the role of adults in this system." Id.

JJRC recommended that the juvenile court should not have jurisdiction over children under the age of 10, that the juvenile court should have jurisdiction over a child of 10 to 12 years old only when the child is alleged to have committed specific identified acts, such as murder or rape, and that "[t]he juvenile court should have jurisdiction over a child at least 13 years old alleged to have committed a delinquent act."  JJRC, Final Report at 19.

In the Racial Equity Impact Note for Senate Bill 691 (2022), the Conclusion section stated, among other things:

> By establishing a minimum age of juvenile court jurisdiction for which a juvenile may be subjected to formal prosecution and court processes, the bill will significantly impact youths under the age of 13.  There has been considerable discussion in the juvenile justice policy arena that preteens have diminished neurocognitive capacity to be held culpable for their actions and also lack the ability to understand legal charges against them.  Specifically, Black juveniles under age 13 will benefit to the greatest extent under the bill given that they are disproportionately and disparately impacted by [Department of Juvenile Services] intakes, dispositions, and placements.  While there was not sufficient data available to reliably estimate the impact of other changes made by the bill, the provisions regarding the expanded use of informal adjustments, limitations on probation, detention, and out-of-home placements, as well as the creation of a permanent commission to conduct evidence-based[] research regarding juvenile rehabilitation, will likely result in positive equity impacts in general.

S.B. 691 (2022), Racial Equity Impact Note at 7-8 (Mar. 28, 2022), available at https://mgaleg.maryland.gov/Pubs/BudgetFiscal/2022RS-SB0691-REIN.pdf    [https://perma.cc/73B6-YXYL].

Generally, under our case law, the nature of a challenge to a court's denial of a motion to dismiss counsels against allowing a ruling on such a motion to be immediately appealable where the challenge depends on a condition precedent to dismissal being appropriate or where the question is which of one or more courts has jurisdiction.  See

Stephens, 420 Md. at 498, 506, 24 A.3d at 106-07, 111; Bunting, 312 Md. at 477-82, 540 A.2d at 807-09; Franklin P., 366 Md. at 328, 783 A.2d at 686.[9]  What makes the outcome different here is that the General Assembly, after extensive study, has enacted legislation, unprecedented in this State, unequivocally removing children who were under the age of the 13 at the time they allegedly committed a delinquent act from the jurisdiction of the juvenile court, except where the child is between the ages of 10 and 12 and alleged to have committed an act that, if committed by an adult, would constitute a crime of violence.  See CJ § 3-8A-03(a)(1), (d)(7).  The General Assembly's legislative removal of children under the age of 13 from jurisdiction of the juvenile court constitutes for those children a right to not be subject to delinquency proceedings, i.e., trial.  That right is akin to the right against double jeopardy, which is expressed in the United States Constitution, and for which an immediate appeal of the denial of a motion to dismiss based on that ground has consistently been permitted.  See Stephens, 420 Md. at 505 n.4, 24 A.3d at 111 n.4.[10]

---

[9]See also Gruber v. Gruber, 369 Md. 540, 541-42, 547, 801 A.2d 1013, 1013-14, 1017 (2002) (holding in a custody case that a party could not appeal from a trial court's ruling that it had jurisdiction because Maryland was the child's home State and the most convenient forum to determine custody, as we had previously held that "a trial court's order denying a challenge to its jurisdiction is a nonappealable interlocutory order" where the "trial court's decision to deny a challenge to its jurisdiction does not settle or conclude the rights of any party or deny the party the means of proceeding further" (citation omitted)).

[10]In a recent decision, the Supreme Court of the United States held the prohibition against double jeopardy does not preclude a defendant from being tried by separate sovereigns (i.e., the federal government and a State government) for the same conduct.  See Gamble v. United States, 587 U.S. 678, 682-84 (2019).  In Gamble, id. at 683, the Supreme Court observed that the Fifth Amendment prohibition against double jeopardy protects a defendant from being put in jeopardy twice for the same offense, but not for the same conduct.  As a result, the Supreme Court concluded that the prohibition against double jeopardy does not protect a defendant against trial for the same conduct by separate

Implicit in the General Assembly's enactment of the JJRA is the premise that children under the age of 13, who are not charged with having committed a violent offense, have a right to be free of involvement in the juvenile system. The State cites Md. State Bd. of Educ. v. Bradford, 387 Md. 353, 384, 875 A.2d 703, 721 (2005), and contends that the outcome here should be consistent with this Court's general view that "a mere allegation that an interlocutory order exceeded the subject matter jurisdiction of the court is not an exception to the final judgment rule and that a trial court's order denying a challenge to its jurisdiction is a nonappealable interlocutory order." (Cleaned up).[11] In the unprecedented circumstances here, we are not persuaded. The juvenile court denied M.P.'s motion to dismiss for lack of jurisdiction, reasoning that it retained jurisdiction over him notwithstanding the enactment of the JJRA. However, if the juvenile court no longer has jurisdiction over M.P. because he was 12 at the time of the alleged offenses and not charged with an act that, if committed by an adult, would constitute a crime of violence, M.P. will not be subject to trial, *i.e.*, an adjudication of delinquency, in juvenile court or anywhere else. As such, this case presents one of the extraordinary situations in which the concept that a matter is not effectively reviewable after the conclusion of trial applies because a

sovereigns because "where there are two sovereigns, there are two laws, and two offences." Id. (cleaned up). This makes even more compelling the conclusion that, under the JJRA, where a juvenile who is under the age of 13 would not be subject to juvenile delinquency proceedings or any proceedings at all, an immediate appeal of the denial of a motion to dismiss a delinquency petition based on a lack of jurisdiction should be permitted under the collateral order doctrine.

[11]In Bradford, 387 Md. at 384-85, 875 A.2d at 721-22, we indicated that an order concerning subject matter jurisdiction could potentially be immediately appealable as a final judgment under certain circumstances, but, if not, "it can certainly be reviewed in an appeal from the final judgment."

right to avoid trial, *i.e.*, a delinquency proceeding, altogether is at stake. It would be contrary to the General Assembly's purpose in enacting the JJRA for this Court to conclude that M.P. and similarly situated children whose cases were pending adjudication of delinquency when the JJRA became effective must undergo adjudication and disposition in the juvenile justice system before an appeal is permitted.

In this case, there are no factual disputes about M.P.'s age at the time of the alleged delinquent acts (he was 12 years old) or whether he has or has not been alleged to have committed an act that, if committed by an adult, would constitute a crime of violence (he has not). Nor is there any dispute concerning a condition precedent to the applicability of the JJRA to M.P. Given that legislative removal of the juvenile courts' jurisdiction over youth under a designated age is unlikely to reoccur, this provides an important limiting factor that gives assurance that applying the collateral order doctrine exception in this instance will not swallow the general rule that an appeal must await final judgment. Further, the particular emphasis placed by the General Assembly on the harm to young children from involvement in delinquency proceedings and the juvenile justice system, from which the General Assembly has sought to protect them, is the sort of "value of a high order" or "substantial public interest"—beyond the "mere avoidance of a trial"—that the Supreme Court has described as necessary to justify application of the collateral order doctrine. Will v. Hallock, 546 U.S. 345, 352-53 (2006) (citation omitted).[12] These

---

[12]In Will, 546 U.S. at 347, 355, the Supreme Court held that the collateral order doctrine did not apply to a trial court's refusal to apply the judgment bar of the Federal Tort Claims Act, and, thus, the trial court's ruling was not immediately appealable. The

- 24 -

dynamics provide a strong rationale for applying the collateral order doctrine to the facts of this case.

The circumstances in Franklin P. provide little insight into the resolution of the issue here.[13]  To be sure, the State is correct that, in Franklin P., 366 Md. at 314, 783 A.2d at 678, we resolved against the juvenile defendant a question involving the immediate appealability of the denial of a motion to dismiss that contested a court's jurisdiction.  We held that the denial of the juvenile's motion to dismiss for lack of jurisdiction was not immediately appealable under the collateral order doctrine because it did not satisfy the last element of the doctrine—*i.e.*, it was not effectively unreviewable on appeal from a final judgment.  See id. at 328, 783 A.2d at 686.

---

Supreme Court explained that the statutory judgment bar, although "arguably broader than traditional res judicata, [] functions in" a similar way, and "[t]he concern behind both rules is . . . of avoiding duplicative litigation, multiple suits on identical entitlements or obligations between the same parties."  Id. at 354 (cleaned up).  The Supreme Court stated that the "rule of respecting a prior judgment by giving a defense against relitigation has not been thought to protect values so great that only immediate appeal can effectively vindicate them."  Id. at 355.  Thus, the Supreme Court concluded that the statutory judgment bar "has no claim to greater importance than the typical defense of claim preclusion" and an order rejecting such a defense "cries for no immediate appeal of right as a collateral order."  Id.

[13]Likewise, the fact that M.P.'s case is not on all fours with O.P., 470 Md. 225, 235 A.3d 40, and Jolley v. State, 282 Md. 353, 384 A.2d 91 (1978), is of no real consequence.  The application of the collateral order doctrine is assessed on a case-by-case basis.  In other words, that this is not a case in which M.P. has been placed outside of the home during the pendency of proceedings, which would make it subject to O.P., 470 Md. at 232-33, 235 A.3d at 44-45, is not dispositive.  Similarly, that this case is different from Jolley, 282 Md. at 358, 384 A.2d at 95, in which we held that an order finding a defendant incompetent to stand trial was immediately appealable, as such a ruling would normally result in indefinite commitment to a mental health facility, does not preclude application of the collateral order doctrine.  O.P. and Jolley serve as nonexclusive examples of the applicability of the doctrine.

In Franklin P., id. at 314, 783 A.2d at 678-80, however, the juvenile defendant's motion to dismiss for lack of jurisdiction involved a waiver of the juvenile court's jurisdiction and an amended statute that expressly identified a waiver of jurisdiction as not immediately appealable. In holding that the denial of the juvenile defendant's motion to dismiss was not immediately appealable, we observed that the analysis required for a waiver of juvenile court jurisdiction includes consideration of five factors,[14] one of which is the nature of the alleged offense. See Franklin P., 366 Md. at 316 n.8, 328, 783 A.2d at 679 n.8, 686. We explained that orders concerning the waiver of juvenile court jurisdiction are not immediately appealable because the analysis could potentially involve factual circumstances related to the nature of the offense that are not completely separate from the merits of the case. See id. at 328, 783 A.2d at 686.[15] We pointed out that were we to hold that juvenile waiver decisions are immediately appealable, the holding would affect a vast number of cases and, in the end, cause delay in juvenile proceedings. See Franklin P., 366 Md. at 328 & n.17, 783 A.2d at 686 & n.17.

---

[14]Currently, CJ § 3-8A-06(e) sets forth the factors the juvenile court must consider for waiver of its jurisdiction as follows: "(1) Age of the child; (2) Mental and physical condition of the child; (3) The child's amenability to treatment in any institution, facility, or program available to delinquents; (4) The nature of the offense and the child's alleged participation in it; and (5) The public safety." (Paragraph breaks omitted).

[15]An additional point that counseled against permitting an interlocutory appeal in Franklin P. is that the General Assembly had once provided that an order pertaining to a waiver of jurisdiction was immediately appealable, but subsequently amended the relevant statute to eliminate immediate appeals. See Franklin P., 366 Md. at 321, 783 A.2d at 682 (discussing the legislative history of the statute that formerly permitted immediate appeal from a waiver of juvenile court jurisdiction). In addition, we observed that, once the juvenile court waived its jurisdiction, the court no longer had authority to take any action with respect to the case, including rescinding its waiver decision. See id. at 331-32, 334-35, 783 A.2d at 688, 689-90.

The appeal in <u>Franklin P</u>. involved an issue that will continue to present itself in the foreseeable future in juvenile delinquency cases, as long as juvenile courts are permitted to waive jurisdiction. In contrast, the question before us is uniquely limited to application of the recent amendments to CJ § 3-8A-03. In <u>Franklin P.</u>, 366 Md. at 335 n.25, 783 A.2d at 690 n.25, we expressly left open resolution of the type of question we face here: we observed that the collateral order doctrine "might apply" in instances in which "no discretion at all is involved and where a court lacks the power to legally try the case in the first instance and the child has the right not to be tried under any circumstances in the criminal court" due to the age of the child in question being outside the parameters for waiver of jurisdiction. (Emphasis omitted). In this case, we agree with M.P. that the collateral order doctrine applies and the denial of his motion to dismiss is immediately appealable.

Even though we agree with M.P. that the collateral order doctrine applies, as in <u>Franklin P.</u>, <u>id.</u> at 335 n.25, 783 A.2d at 690 n.25, we caution that our holding is limited. Our holding in this case should not be read to extend the collateral order doctrine to instances of the denial of a motion to dismiss for lack of jurisdiction under CJ § 3-8A-03(a)(1) and (d)(7) that involve factual disputes about the age of a juvenile, or disputes concerning the nature of the offense charged, such as disagreements about whether alleged conduct would constitute a crime of violence under CR § 14-101 if committed by an adult. Our holding is limited to M.P.'s challenge to the jurisdiction of juvenile courts over delinquency proceedings involving children under the age of 13 for non-violent offenses that were pending on the effective date of the JJRA. Our determination that M.P.'s

interlocutory appeal is permitted does not foreclose the possibility that, under different circumstances, a jurisdictional challenge under CJ § 3-8A-03 might not result in the allowance of an immediate appeal under the collateral order doctrine.

## II. Applicability of CJ § 3-8A-03 to Juvenile Proceedings Pending as of June 1, 2022

### A. The Parties' Contentions

M.P. contends that, because his case was pending when the JJRA became effective on June 1, 2022, its new jurisdictional limitations divested the juvenile court of jurisdiction over him.  M.P. asserts that this is because neither the plain language of the JJRA nor its legislative history expressly indicates that the General Assembly did not intend it to apply to cases pending at the time of its enactment.  M.P. relies on Waker v. State, 431 Md. 1, 11, 63 A.3d 575, 580-81 (2013), for the proposition that, unless the statute states otherwise, when the General Assembly amends a statute to decrease a criminal penalty, the new penalty applies to cases in which the defendant has not yet been sentenced.  M.P. contends that the same principle applies to his case.

M.P. points out that the Court of Appeal of the State of California, Fifth Appellate District, took a similar approach in In re David C., 267 Cal. Rptr. 3d 766, 767, 770-71 (Cal. Ct. App. 5th Dist. 2020), in which it determined that a statutory amendment that created a jurisdictional minimum age for juvenile courts of 12 years old ended the court's continuing jurisdiction over a child not alleged to have committed certain offenses and who was younger than 12 years old when the offenses were originally committed.  M.P. asserts that the analysis in David C. was grounded in a rule from another California case, which this Court favorably cited in Waker, 431 Md. at 13, 63 A.3d at 582—namely, a rule from In re

Estrada, 408 P.2d 948, 951 (Cal. 1965) (en banc), which, according to M.P., is that, "when the legislature amends a statute to lessen a punishment, that action itself is an express determination that the former penalty was too severe and the new penalty should apply as broadly as possible." (Citing David C., 267 Cal. Rptr. 3d at 768-69). M.P. argues that this Court should apply the same logic and conclude that, because his case was pending at the time that the JJRA became effective, the juvenile court lost jurisdiction over him.

M.P. contends that the body of law concerning retrospective versus prospective applicability of statutes does not apply because this case does not involve a retroactive application of an amended statute to a previously adjudicated case. Nonetheless, M.P. asserts that, even under a retroactivity analysis, his case should be dismissed because applying the JJRA "retrospectively comports with the legislative intent to exclude young children as a class from the juvenile courts." (Bolding omitted). M.P. asserts that any question about the applicability of the JJRA's jurisdictional limits to his case under a retroactivity analysis should be resolved in his favor because the JJRA constitutes a procedural and remedial change in the law that does not impact substantive rights.

The State agrees that the change to the juvenile court's jurisdiction under CJ § 3-8A-03 ended the court's jurisdiction over M.P. The State contends that, although the juvenile court "obtained exclusive original jurisdiction over the action" when the State filed the delinquency petition against M.P. on May 5, 2022, jurisdiction ended as a matter of law when the JJRA and its changes to juvenile court jurisdiction took effect on June 1, 2022.

The State agrees that this case does not involve an issue of retroactive application of changes in juvenile court jurisdiction, and states that applying "CJ § 3-8A-03(d)(7) to

- 29 -

prevent future judicial action is the same as applying a statute prospectively." The State

contends that, under John Deere Constr. and Forestry Co. v. Reliable Tractor, Inc., 406 Md.

139, 147-48, 957 A.2d 595, 599-600 (2008), which incorporates the Supreme Court's

holding in Landgraf v. USI Film Prods., 511 U.S. 244, 269-70, 280 (1994), applying the

JJRA's new jurisdictional requirements to M.P.'s case would not involve a retroactive

application of the law, as retroactivity does not turn on when the conduct at issue occurred,

but rather the "relevant event for retroactivity purposes" is when the juvenile court

conducts a delinquency proceeding, and, because an adjudication of delinquency has yet

to occur in this case, the JJRA would be applied prospectively.

## B. Standard of Review

Because the question of whether the change to the juvenile court's jurisdiction under

CJ § 3-8A-03 applies to M.P. is an issue of statutory interpretation, we review the juvenile

court's decision without deference, *i.e.*, *de novo*. See Krikstan, 483 Md. at 64, 290 A.3d

at 987.

## C. Jurisdiction of the Juvenile Court

### *Statutory Jurisdiction under CJ § 3-8A-03 and the Effect of the JJRA*

The juvenile court is a court of limited jurisdiction that can exercise only authority

specified by statute. See Smith v. State, 399 Md. 565, 574, 924 A.2d 1175, 1180 (2007).

With regard to a delinquency petition, a juvenile court's jurisdiction is governed by CJ §

3-8A-03. Prior to the effective date of the JJRA, the juvenile court had exclusive original

jurisdiction over, with exceptions not relevant here, all children (*i.e.*, persons under 18

years of age) "alleged to be delinquent or in need of supervision or who ha[ve] received a

citation for a violation" without a minimum age restriction. CJ (2021) §§ 3-8A-03(a)(1), 3-8A-01(d); 2001 Md. Laws 2443 (Vol. IV, Ch. 415, S.B. 660).

Through the JJRA, the General Assembly amended CJ § 3-8A-03 by restricting the juvenile court's jurisdiction in delinquency cases to children who are at least 13 years old, with the exception of those who are 10 to 12 years old and alleged to have committed an act that would be classified as a crime of violence if committed by an adult. See 2022 Md. Laws ___ (Vol. ___, Ch. 41, S.B. 691); 2022 Md. Laws ___ (Vol. ___, Ch. 42, H.B. 459). A provision in the same subtitle that predated the JJRA, and was unaffected by the new law, provides that "the age of the person at the time the alleged delinquent act was committed controls the determination of jurisdiction under this subtitle." CJ § 3-8A-05(a). Thus, under CJ § 3-8A-05(a), the child's age on the date of the alleged delinquent act is the determinative point for establishing a juvenile court's jurisdiction in a delinquency case.

### *Relevant Case Law*

In the absence of instruction otherwise from the General Assembly, our precedent establishes that newly-enacted statutes generally apply prospectively, not retroactively. See Langston v. Riffe, 359 Md. 396, 406, 754 A.2d 389, 394 (2000). In this context, the word "retroactive"—and its interchangeable synonym, "retrospective"—mean that the statute in question "operate[s] on transactions which have occurred or rights and obligations which existed before passage of the act." Id. at 406, 754 A.2d at 394 (cleaned up). "The question [of] whether a statute operates retrospectively, or prospectively only, ordinarily is one of legislative intent." Id. at 406, 754 A.2d at 394 (citation omitted).

- 31 -

Among the exceptions to the general rule of prospectivity is that statutes that are procedural or remedial apply retroactively. See id. at 406-08, 754 A.2d at 394-95. Another exception to the general rule of prospectivity "is that a statute which affects a matter still in litigation when the statute becomes effective will be applied by a reviewing court even though the statute was not then law when the decision appealed from was handed down, unless the legislature expresses a contrary intent." State v. Johnson, 285 Md. 339, 343, 402 A.2d 876, 878 (1979) (citations omitted). "Thus many courts adhere to the proposition that in the absence of a contrary expression of intent, a cause of action or remedy dependent upon a statute falls with the repeal of [the] statute." Id. at 344, 402 A.2d at 878 (citations omitted).

This conceptual framework was laid out by the Supreme Court of the United States in Landgraf, 511 U.S. at 269-70, 280, and has been adopted by this Court. See John Deere, 406 Md. at 147-48, 957 A.2d at 599-600. A statute is retroactive when it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280. However, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment[.]" Id. at 269 (citation omitted). Significantly, in Landgraf, id. at 274, the Supreme Court observed that it had "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." A statutory change to a court's jurisdiction does not affect substantive rights, and thus does not implicate retroactivity, but rather should be applied prospectively because it "speak[s] to the power of the court" to act on the case in question. Id. at 274 (cleaned up). Put

- 32 -

differently, "when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law[.]" Bruner v. United States, 343 U.S. 112, 116-17 (1952).

We have held that, when the General Assembly lessens a penalty for a particular criminal offense after the defendant's alleged conduct occurred but before conviction and sentencing, the new, lesser penalty applies. See Waker, 431 Md. at 12, 63 A.3d at 581. In Waker, id. at 2-3, 12, 63 A.3d at 575-76, 581, we concluded that, because the General Assembly raised the monetary threshold for felony theft from $500 to $1,000, after the defendant was charged with theft of $615 worth of goods but before he was convicted and sentenced, his sentence for felony theft was illegal. The State had argued, based on Johnson, 285 Md. 339, 402 A.2d 876, that Maryland's general saving clause (now codified at Md. Code Ann., Gen. Prov. (2014, 2019 Repl. Vol.) ("GP") § 1-205) prevented the statutory change from affecting the outcome of the case. See Waker, 431 Md. at 9-10, 63 A.3d at 579-80. We disagreed, distinguishing Johnson because that case concerned a sentence that had been imposed prior to the statutory change at issue, whereas Waker had not been convicted or sentenced when the statute concerning his offense was amended. See Waker, 431 Md. at 11, 63 A.3d at 580. We concluded that the statutory change applied to Waker's sentence, rendering it illegal, because the saving clause preserved only "any penalty, forfeiture or liability, either civil or criminal, which shall have been incurred under" the prior version of the statute, whereas Waker had incurred no such penalty or liability prior to his conviction, meaning he was entitled to the new, lesser penalty. Id. at 12, 63 A.3d at 581 (cleaned up).

- 33 -

As M.P. points out, an appellate court in another jurisdiction has tackled a statutory change to juvenile court jurisdiction and considered application of the statutory amendment to cases that arose before the law changed.  See David C., 267 Cal. Rptr. 3d at 767.  In David C., id., a child challenged his delinquency adjudication for conduct that occurred when he was 11 years old and the validity of subsequent proceedings against him for a probation violation after the California legislature removed children under 12 years of age from juvenile court jurisdiction.  The Court of Appeal of the State of California, Fifth Appellate District, concluded that, by operation of law, when the statutory change became effective, the juvenile court lost its jurisdiction over the child in relation to the conduct that occurred when he was 11 years old.  See id.

The Court relied on precedent of the Supreme Court of California under which the legislature's change to a statute that lessens penalties leads to "an inevitable inference" that such "ameliorative changes" are intended, absent contrary instruction, "to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not."  Id. at 768-69 (quoting Estrada, 408 P.2d at 951, and People v. Conley, 373 P.3d 435, 440 (Cal. 2016)) (internal quotation marks omitted).  Although the Court declined to overturn the adjudication of delinquency, which occurred before the jurisdictional change became effective, the Court determined that "any and all actions taken by the juvenile court after" the effective date of the jurisdictional change "that were based on the original petition — including the findings [that the] minor violated probation — were void for lack of jurisdiction."  Id. at 770 (footnote omitted).

- 34 -

**D. The Juvenile Court's Jurisdiction over M.P.**

We hold that, under the plain language of the JJRA, the juvenile court lost jurisdiction over M.P. on June 1, 2022, when the jurisdictional limits of the JJRA became effective. Leaving aside the question of retroactivity, under the plain language of CJ § 3-8A-03(d)(7), the court lacked jurisdiction over the delinquency proceeding against M.P., who was under the age of 13 years at the time of the alleged delinquent acts—as CJ § 3-8A-05(a) provides that jurisdiction is to be determined by the age of the person at the time the alleged delinquent act was committed, and the JJRA's exception for 10- to 12-year-olds charged with an act that, if committed by an adult, would be a crime of violence does not apply. Nothing in the JJRA provides that its change in juvenile court jurisdiction does not apply to pending cases. Thus, based on the plain language of the statute, the juvenile court erred in failing to grant M.P.'s motion to dismiss.

By way of analogy, we note that in <u>Parojinog v. State</u>, 282 Md. 256, 258, 264, 384 A.2d 86, 87, 90 (1978), this Court addressed whether 1975 (Reg. Sess.) Md. Laws 2677 (Ch. 554, H.B. 483), which amended Md. Code Ann., Cts. & Jud. Proc. (1974) § 3-807[16] "to provide that the juvenile court 'has exclusive original jurisdiction, but only for the purpose of waiving it, over an adult (i.e., a person over 18 years of age) who is alleged to have committed a delinquent act while a child[,]'" resulted in the juvenile court losing jurisdiction over a defendant who was 18 years old at the time that delinquency petitions

---

[16]The relevant provision is now CJ § 3-8A-07(e), which states that a juvenile "court has exclusive original jurisdiction, but only for the purpose of waiving it, over a person 21 years of age or older who is alleged to have committed a delinquent act while a child."

were filed but was 17 years old at the time of the alleged delinquent acts. (Emphasis omitted). The juvenile petitions had been filed before the statutory provision restricting the juvenile court's jurisdiction over an adult alleged to have committed a delinquent act while a child had become effective. See Parojinog, 282 Md. at 257, 264, 384 A.2d at 87, 90. The juvenile court, without deciding first whether to waive its jurisdiction, as requested by the State, made what we determined to be an adjudication and disposition, and six months later issued an order waiving juvenile jurisdiction, which resulted in an indictment being filed against the defendant in the trial court based on the same acts. See id. at 258-59, 262, 384 A.2d at 87-89. The defendant alleged double jeopardy. See id. at 259, 384 A.2d at 88. The State contended that the juvenile court had no jurisdiction to make an adjudication or disposition and, as such, jeopardy could not attach. See id. at 265, 384 A.2d at 90-91. We concluded that the juvenile court had jurisdiction. See id. at 265, 384 A.2d at 91.

In assessing whether the new provision—i.e., Md. Code Ann., Cts. & Jud. Proc. (1974, 1975 Supp.) ("CJ (1975)") § 3-807(b)—divested the juvenile court of jurisdiction, we stated that "[i]t is the time the petition is filed, not the time of adjudication, which determines the jurisdiction of the juvenile court and the applicability of" CJ (1975) § 3-807(b). Id. at 265, 384 A.2d at 91 (citations omitted). In describing the statutory scheme relating to juvenile causes, we explained that, under CJ (1975) § 3-805(a), "where a person is alleged to be delinquent, 'the age of the person at the time alleged delinquent act was committed controls the determination of jurisdiction[.]'" Id. at 260, 384 A.2d at 88. The same standard for determining a juvenile court's jurisdiction exists today in CJ § 3-8A-

05(a) and applies to the JJRA—"the age of the person at the time the alleged delinquent act was committed controls the determination of jurisdiction under this subtitle." CJ § 3-8A-05(a).[17]

Parojinog and the cases cited in it endorse the principle set forth in CJ § 3-8A-05(a), that the age of the child at the time that the alleged delinquent act was committed controls the determination of the jurisdiction of the juvenile court. This is just as the State indicates in its brief in this Court. Quoting Parojinog, 282 Md. at 260, 384 A.2d at 88, the State explains that, "[w]hen a delinquency petition is filed, the circuit court, sitting as a juvenile court, obtains 'exclusive original jurisdiction' over the action[,]" and, under CJ § 3-8A-05(a), the age of the person at the time the alleged delinquent act was committed controls the determination of jurisdiction.

---

[17]In Parojinog, 282 Md. at 265, 384 A.2d at 91, we cited two additional cases—In re Appeals No. 1022 and No. 1081, Sept. Term, 1975 from Cir. Ct. for Kent Cnty. sitting as a Juv. Ct., 278 Md. 174, 175, 359 A.2d 556, 557 (1976) and In re Appeal No. 1038(75) from Cir. Ct. for Cecil Cnty., 32 Md. App. 239, 241-42, 360 A.2d 18, 20 (1976)—in which this Court and the Appellate Court addressed the applicability of CJ (1975) § 3-807(b). In Appeals No. 1022 and No. 1081, 278 Md. at 176, 359 A.2d at 558, the juvenile court dismissed juvenile petitions, ruling that CJ (1975) § 3-807(b) precluded it from exercising jurisdiction where the individual was under 18 years old at the time of the alleged delinquent act but was over 18 years old when the delinquency petitions were filed, and where the juvenile court determined that a waiver of jurisdiction would be inappropriate. This Court affirmed the juvenile court's judgments and rejected the State's contention that CJ (1975) § 3-807(b) did not apply because the alleged offenses occurred before the statutory provision became effective, stating that the time of the filing of the petitions— which, in those cases, was after the new statutory provision became effective—was determinative of when the jurisdiction of the juvenile court attached. See id. at 176, 179-80, 359 A.2d at 558, 560. In Appeal No. 1038(75), 32 Md. App. at 243 n.5, 360 A.2d at 20 n.5, the Appellate Court explained that, in cases where an allegation is made that a child is delinquent, "the age of the child at the time the alleged delinquent act was committed controls the determination of jurisdiction of the juvenile court[.]" (Citation omitted).

CJ § 3-8A-07(a) provides that, "[i]f the court obtains jurisdiction over a child under this subtitle, that jurisdiction continues until that person reaches 21 years of age unless terminated sooner." Jurisdiction can continue only where jurisdiction exists. As explained in detail herein, a juvenile court does not have jurisdiction over a child who was under the age of 13 at the time of an alleged non-violent delinquent act where a petition was pending an adjudication of delinquency when the JJRA took effect.

By contrast, under circumstances very different than those of this case, in In re Valerie H., 310 Md. 113, 116-17, 527 A.2d 42, 43-44 (1987), a CINA case, this Court observed that, under Md. Code Ann., Cts. & Jud. Proc. (1974, 1984 Repl. Vol.) ("CJ (1984)") § 3-806(a) (which is now CJ § 3-8A-07(a)), "jurisdiction, once acquired, terminates [] only if the juvenile court so orders." At that time, all juvenile causes—those involving children alleged to be delinquent, in need of supervision, or in need of assistance—were governed by the same statutory scheme, and CJ (1984) § 3-806(a) provided that the juvenile court's jurisdiction over those cases continued until the person reached 21 years of age unless terminated sooner. See id. at 117, 527 A.2d at 44. Today, separate statutory subtitles govern juvenile causes involving children in need of assistance, see CJ §§ 3-801 to 3-830, and juvenile causes involving children other than those in need of assistance, i.e., delinquency cases, see CJ §§ 3-8A-01 to 3-8A-35.

With respect to children in need of assistance, i.e., CINA cases, CJ § 3-804(b) differs from CJ § 3-8A-07(a) by providing: "If the court obtains jurisdiction over a child, that jurisdiction continues in that case until the child reaches the age of 21 years, **unless the court terminates the case.**" (Emphasis added). In other words, in CINA cases, CJ § 3-

804(b) contemplates that the juvenile court's jurisdiction, once acquired, continues until the child is 21 unless the juvenile court terminates the case, *i.e.*, so orders. In contrast, CJ § 3-8A-07(a), which applies to delinquency cases, provides that, "[i]f the court obtains jurisdiction over a child under this subtitle, that jurisdiction continues until that person reaches 21 years of age unless terminated sooner." CJ § 3-8A-07(a) does not expressly require that jurisdiction be terminated by the court and jurisdiction can be terminated by operation of law where, as here, there is a change in the law or by order of the court.[18]

In <u>Valerie H.</u>, 310 Md. at 114, 117, 527 A.2d at 43-44, our observation that jurisdiction continues until a child is 21 unless terminated by order of the juvenile court was made as we interpreted an earlier version of CJ § 3-8A-07(a) in a case in which a child had been found to be CINA. The child's care and custody had been committed to the Department of Social Services for Baltimore City. <u>See</u> <u>id.</u> at 114, 527 A.2d at 43. Later, the juvenile court discharged the department from responsibility for the child's custody, but did not expressly terminate the juvenile court's jurisdiction over the child. <u>See</u> <u>id.</u> at 115-16, 527 A.2d at 43-44. Subsequently, the department returned the child to foster care placement but did not petition for recommitment until after the child turned 18, and this Court determined that the juvenile court retained jurisdiction over the child until age 21 (permitting recommitment and assistance for the child). <u>See</u> <u>id.</u> at 116, 120, 527 A.2d at 43, 45. In <u>Valerie H.</u>, our statement that jurisdiction did not terminate until age 21 unless

---

[18]In making this observation, we do not rule out the possibility that under CJ § 3-804(b) jurisdiction may also be terminated by operation of law. That question, however, is not before this Court today.

ordered by the court was not made in the context of interpreting CJ § 3-8A-07(a) in a delinquency case, let alone where new legislation had been passed limiting a juvenile court's jurisdiction in delinquency cases.

In this instance, retroactive application of a jurisdictional amendment is not at issue because the jurisdictional question here concerns the authority of the juvenile court to take the action at issue subsequent to the effective date of the JJRA. The issue does not involve a question of retroactivity "merely because [CJ § 3-8A-03(d)(7)] is applied in a case arising from conduct antedating the statute's enactment[.]" Landgraf, 511 U.S. at 269 (citation omitted). When interpreting a jurisdictional statute, for purposes of retroactivity, the relevant event "is the moment at which that power is sought to be exercised. Thus, applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively; but applying it to prevent any judicial action after the statute takes effect is applying it prospectively." Id. at 293 (Scalia, J., concurring in judgment). In this case, M.P. does not seek to apply CJ § 3-8A-03 to any of the juvenile court's actions prior to June 1, 2022, but rather to prevent the court from exercising jurisdiction over him after that date, when the juvenile court no longer possesses jurisdiction.

Our precedent requires the outcome we reach because, without "a contrary expression of intent, a cause of action or remedy dependent upon a statute falls with the repeal of [the] statute." Johnson, 285 Md. at 344, 402 A.2d at 878 (citations omitted). With no indication in the JJRA that the General Assembly intended for the changes to CJ

§ 3-8A-03 not to apply[19] to pending cases, jurisdiction over the delinquency petition and proceeding fell with the repeal of the juvenile courts' jurisdiction over children charged with nonviolent conduct that occurred when they were under 13 years old. In Landgraf, 511 U.S. at 274, the Supreme Court explained that it had applied intervening statutes removing jurisdiction, regardless of whether jurisdiction lay when the underlying conduct occurred or when an action was filed. The Supreme Court explained that, in Bruner, 343 U.S. at 116-17, relying on its "consistent practice," the Court "ordered an action dismissed because the jurisdictional statute under which it had been (properly) filed was subsequently repealed." Landgraf, 511 U.S. at 274 (cleaned up). We adopted the same approach in John Deere, 406 Md. at 147-48, 957 A.2d at 599-600, with respect to jurisdictional statutory changes. And, our holding in Johnson, 285 Md. at 344, 402 A.2d at 878, parallels the rationale expressed by the Supreme Court of the United States in Bruner, 343 U.S. at 116-17, on this point: "[W]hen a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law[.]"

Our conclusion is also consistent with our holding in Waker and a long line of precedent providing that, where a statute is amended or repealed "after an alleged offense or after an event giving rise to some alleged liability, a court, including an appellate court, would generally apply the law as it existed when the court was considering the case and not the law in effect when the alleged offense or event occurred." Waker, 431 Md. at 9-

---

[19]The General Assembly could have instructed that the change would not apply to pending cases, just as it could have explicitly directed that the jurisdictional change apply to such cases. But the General Assembly did neither—hence, our reliance on principles of statutory construction and case law.

10, 63 A.3d at 580 (citations omitted).  Although a juvenile delinquency proceeding is not a criminal proceeding, there are basic similarities between the two, and, as M.P. points out, that a delinquency proceeding does not result in a criminal conviction "does not mean that a juvenile gives up all rights that a person would be entitled to in a criminal proceeding." (Quoting In re Anthony R., 362 Md. 51, 69, 763 A.2d 136, 146 (2000)) (internal quotation marks omitted).  Just as we applied the new, lesser statutory penalty in Waker, 431 Md. at 2-3, 12, 63 A.3d at 575-76, 581, which had taken effect while the charges at issue were pending, in this case, we apply the amended version of the statute, rather than the version in effect at the time of the conduct or the initiation of the delinquency proceeding.[20]

Lastly, we note that the general saving statute, GP § 1-205, is inapplicable.[21]  To be sure, in State v. Clifton, 177 Md. 572, 576, 10 A.2d 703, 705 (1940), this Court observed

---

[20]Like the Court in David C., 267 Cal. Rptr. at 768-69, we are bound by precedent under which, absent a demonstration of intent to the contrary, a statutory amendment that lessens a criminal penalty should be applied to any pending cases in which the defendants have not yet been sentenced.  See Waker, 431 Md. at 12, 63 A.3d at 581.

[21]GP 1-205 provides:

(a) Except as otherwise expressly provided, the repeal, repeal and reenactment, or amendment of a statute does not release, extinguish, or alter a criminal or civil penalty, forfeiture, or liability imposed or incurred under the statute.

(b) A repealed, repealed and reenacted, or amended statute shall remain in effect for the purpose of sustaining any:

(1) criminal or civil action, suit, proceeding, or prosecution for the enforcement of a penalty, forfeiture, or liability; and

(2) judgment, decree, or order that imposes, inflicts, or declares the penalty, forfeiture, or liability.

- 42 -

that, although "the repeal of a statute prevents any further proceedings thereunder at common law," Maryland's general saving clause, now GP § 1-205, "has the effect of continuing the repealed statute in force for the purpose of punishing for the offenses committed prior to the repeal." (Citation omitted). However, Clifton and the circumstances under which we made that observation are not instructive here. Clifton involved a statutory amendment that "confer[ed] jurisdiction upon Justices of the Peace concurrent with the Circuit Courts to try cases of alleged violations" of a statute, which had been amended rather than repealed outright. Id. at 575, 10 A.2d at 704. In Clifton, id. at 574, 10 A.2d at 704, the defendant had been indicted and arrested on a charge of selling an alcoholic beverage without a license in violation of the State Alcoholic Beverages Act. After the statute was amended by being repealed and reenacted with amendments that did not abolish the offense that the defendant had been charged with, the defendant filed a motion to quash the indictment on the ground that the statute on which the indictment was based had been repealed, which the trial court granted. See id. at 574, 10 A.2d at 704.

This Court held that the trial court erred in quashing the indictment and reversed and remanded the case, concluding that "the Alcoholic Beverages Act was not repealed, and even if had been repealed the prosecution of the [defendant] would be saved by the general saving statutes[.]" See id. at 577, 10 A.2d at 705. We explained that, even if the statute had been repealed, the general saving statute would have permitted the State to prosecute the defendant because, "[w]hile the repeal of a statute prevents any further proceedings thereunder at common law, it is well established that where there is a saving clause granting to the State or Federal Government the right to punish for offenses

committed before the repeal, the general rule is rescinded." Id. at 576, 10 A.2d at 705. The saving clause could be contained in the repealing statute or as a general provision applicable to all penal statutes, but, in either case, would have "the effect of continuing the repealed statute in force for the purpose of punishing for the offenses committed prior to the repeal." Id. at 576, 10 A.2d at 705 (citation omitted).

The scenario in Clifton is readily distinguishable from the JJRA's limiting jurisdiction in order to prevent children under the age of 13 years, with certain exceptions, from being subjected to juvenile delinquency proceedings. Put simply, Clifton does not support the applicability of the general saving clause to a law in which the General Assembly sought to avoid harm to young children by limiting their exposure to the juvenile justice system.

### III. Conclusion

We hold that the juvenile court's denial of M.P.'s motion to dismiss for lack of juvenile court jurisdiction was immediately appealable under the collateral order doctrine. We further hold that the juvenile court does not have jurisdiction over a child in a delinquency proceeding where the child was under 13 years old at the time of the alleged delinquent act, the petition for juvenile delinquency does not charge the child (if between 10 and 12 years old) with the commission of an act that, if committed by an adult, would be a crime of violence as specified in CR § 14-101, and the petition was pending adjudication of delinquency as of the effective date of the JJRA. See CJ § 3-8A-03(a)(1), (d)(7). In other words, the JJRA's change to juvenile court jurisdiction applies to cases pending when the law took effect; as such, the juvenile court erred in denying M.P.'s

- 44 -

motion to dismiss.[22]

For the reasons set forth above, in the order issued on September 8, 2023, we denied

the State's motion to dismiss the appeal in this case and reversed the August 8, 2022 ruling

of the juvenile court denying M.P.'s motion to dismiss the delinquency petition pending

against him in Case No. JA-22-0183.  See M. P., 486 Md. at 93-94, 301 A.3d at 1254-55.

---

[22]Nothing in this opinion should be interpreted as concluding that a juvenile court would lack jurisdiction with respect to a child under the age of 13 who had already been found delinquent at the time the JJRA took effect on June 1, 2022.  The Court's holding involves only the circumstances of this case, in which a petition, alleging that a child under the age of 13 had committed a non-violent delinquent act, was pending adjudication of delinquency in a juvenile court as of the effective date of the JJRA.

IN THE SUPREME COURT

OF MARYLAND

No. 3

September Term, 2023

_____

IN RE M.P.

_____
_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Dissenting Opinion by Gould, J.
which Biran, J. joins

_____

Filed: April 23, 2024


*Hotten, J., participated in the hearing of the case, in the conference in regard to its decision, and in the adoption of the opinion as an active judge. She retired from the Court and was recalled to senior status prior to the filing of the opinion.

I respectfully dissent. This case raises two questions of jurisdiction. The first is whether the juvenile court's denial of M.P.'s motion to dismiss was immediately appealable. The second is whether the jurisdictional changes under the Juvenile Justice Reform Act ("JJRA") divested the juvenile court of jurisdiction over M.P.'s delinquency proceeding on June 1, 2022.

On appeal,[1] the parties both contend that the JJRA divested the juvenile court of jurisdiction when the JJRA went into effect. The parties focused on the appealability issue at oral argument. Later that day, the Court, with a Majority concurring, entered an order reversing the juvenile court's order. The Majority concluded that the juvenile court's order was immediately appealable under the collateral order doctrine and that the JJRA divested the juvenile court of jurisdiction when it went into effect on June 1, 2022. The order called for an immediate mandate and indicated that an opinion would follow.

At that time, I believed that my dissent would focus on the appealability issue. As I got deeper into the drafting process, I became convinced that the Court incorrectly determined that the JJRA divested the juvenile court of jurisdiction. I continue to believe that the collateral order doctrine does not apply, but my concern about the ramifications of applying that doctrine here is mitigated by the narrow way the Majority applied it here. Thus, I will only briefly explain why I believe the Majority incorrectly decided that issue and devote the rest of this dissent to the jurisdiction issue.

---

[1] The State is now represented by the Attorney General instead of the State's Attorney for Prince George's County.

As to the juvenile court's jurisdiction, the issue is not what "does not have jurisdiction" means in the context of subsection 3-8A-03(d)(7) of the Courts and Judicial Proceedings ("CJ") Article of the Maryland Annotated Code (2020 Repl. Vol., 2022 Supp.);[2] the question is whether subsection (d)(7) applies to pending cases. Because the text of the JJRA does not expressly say that it does not apply to pending cases, the Majority concludes that it does. In my view, the opposite conclusion should be drawn: The General Assembly drafted the JJRA under the presumption that its jurisdictional changes would *not* apply to pending cases and included no language to the contrary. I arrived at this conclusion for several independent reasons.

First, the Majority's plain language analysis focuses on the introductory phrase of CJ § 3-8A-03(d) along with subpart (7) but disregards another relevant provision—CJ § 3-8A-07(a). Subsection CJ § 3-8A-07(a) states that once the juvenile court acquires jurisdiction, such jurisdiction continues until the child reaches the age of 21 unless such jurisdiction is "terminated sooner." Applying this provision over forty years ago, we held that a jurisdiction-narrowing amendment does *not* terminate jurisdiction acquired before the amendment's effective date. *See Parojinog v. State*, 282 Md. 256, 265 (1978). The General Assembly was presumably aware of that precedent yet did not express a clear intention to abrogate it. We can fairly presume, therefore, that the General Assembly

_____

[2] Unless the context indicates otherwise, when referring to a specific "subsection," I am referring to a subsection of CJ § 3-8A-03. In addition, unless the context indicates otherwise, a reference to a "section" of a statute refers to a section in the Courts and Judicial Proceedings Article.

intended to follow such precedent. The Majority's discussion of *Parojinog* side steps the crux of our analysis and holding in that case.

Second, the Majority's interpretation conflicts with Maryland's general savings statute. Md. Code Ann., Gen. Provis. ("GP") § 1-205 (2014, 2019 Repl. Vol.). The General Assembly was obviously aware of that statute and how it would apply to the JJRA yet failed to put the JJRA out of its reach. In contending that the general savings statute does not apply, the Majority dismisses without explanation the caselaw that, in my view, compels its application here.

And finally, the Majority's interpretation allows for consequences that the General Assembly could not have intended. Had it so intended, the General Assembly would have had a practical reason to explicitly state that the JJRA's jurisdictional changes would apply to pending cases: to avoid the waste of time and resources. The Majority's interpretation requires acceptance of the premise that the General Assembly intended for resources to be devoted to investigating incidents and filing delinquency proceedings in the months before the JJRA's effective date, even though it knew and intended that such cases would have to be dismissed. That, among other problematic consequences of the Majority's analysis discussed below, supports the commonsense conclusion that the General Assembly did not intend to divest the juvenile court of jurisdiction over pending cases when the JJRA went into effect.

## THE COLLATERAL ORDER DOCTRINE

In my view, the Majority erred in applying the collateral order doctrine here. As the Majority explains, the collateral order doctrine is meant to be a limited exception to the

3

final judgment rule. Here, the Majority concludes that "[i]mplicit in the General Assembly's enactment of the JJRA is the premise that children under the age of 13, who are not charged with having committed a violent offense, have a right to be free of involvement in the juvenile system." Maj. Op. at 23. The Majority also cites legislative history to make the point that an immediate appeal fulfills the General Assembly's goal of protecting "young children from involvement in delinquency proceedings and the juvenile justice system" without risking undue expansion of the collateral order doctrine's applicability because there is no dispute about M.P.'s age and, the Majority speculates, further amendments removing "the juvenile courts' jurisdiction over youth under a designated age [are] unlikely to reoccur[.]" Maj. Op. at 24. To prevent this narrow exception from swallowing the final judgment rule, the Majority tailor-made its analysis to fit the specific circumstances of M.P.'s case.

The collateral order doctrine applies if the order: "(1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, *and* (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment." *Stephens v. State*, 420 Md. 495, 502 (2011) (quoting *In re Foley*, 373 Md. 627, 633 (2003)). In this case, the collateral order doctrine falls short on the fourth element.

The fourth element "turns on whether there will be a serious risk of irreparable loss of the claimed right if appellate review is deferred until after trial." *Harris v. David S. Harris, P.A.*, 310 Md. 310, 318 (1987) (citing *Parrott v. State*, 301 Md. 411, 425 (1984)). The Majority contends that the JJRA creates a right for children under the age of 13 "to not

4

be subject to delinquency proceedings, i.e., trial." Maj. Op. at 22. As explained below, "delinquency proceedings" encompass far more than just the adjudicatory or disposition hearings, and so the Majority's premise is wrong. Regardless, the legislative history reflects the General Assembly's concern with the effect on children from dispositions, particularly those involving detention.[3] The legislative history does not suggest a motivating concern that mere participation in an adjudicatory hearing irreparably harms such children. Although the General Assembly adopted the JJRC's view that children under 13 years of age cannot adequately understand the charges, their rights, and the role of adults in the process, the resulting risk to such children is an adverse finding and disposition.

An adverse finding and disposition, however, can be stayed and then reversed on appeal. Thus, an order denying a motion to dismiss for lack of jurisdiction could be effectively reviewed on appeal. I would hold that the fourth element of the collateral order doctrine does not apply and would dismiss the appeal.

Ordinarily, when we dismiss an appeal, we do not address its merits. *Eastgate Assocs. v. Apper*, 276 Md. 698, 704 (1976). But sometimes we do, particularly "to resolve a matter of substantial importance." *Thanos v. State*, 332 Md. 511, 521 (1993). In my view, the Majority would be standing on firmer ground by following that path rather than

---

[3] *Juvenile Justice Reform: Hearing on S.B. 691 Before the Md. S. Comm. on Judicial Proceedings*, 2022 Gen. Assemb., Reg. Sess. (Md. 2022), *archived at* https://perma.cc/DJ76-2LFP; *Testimony of Senator Jill P. Carter in Favor of Senate Bill 691–Juvenile Justice Reform–Before the Md. S. Comm. on Judicial Proceedings*, 2022 Gen. Assemb., Reg. Sess. 2 (Md. 2022) (statement of Sen. Jill P. Carter, Member, S. Comm. on Judicial Proceedings) (on file with the Maryland Department of Legislative Services); Md. Juv. Just. Reform Council, *Final Report* 17 (2021), *archived at* https://perma.cc/4DS9-T5PH.

applying the collateral order doctrine. In any event, because the Majority *did* reach the merits—incorrectly in my view—so will I.

## JURISDICTION OF THE JUVENILE COURT

### *The Juvenile Causes Statute*

M.P. allegedly stole a car in March 2022, prompting the State to file a delinquency petition against him on May 5, 2022. When that petition was filed, the juvenile court acquired jurisdiction over M.P. under CJ § 3-8A-03 (2020 Repl. Vol.). Subsections (a) and (d), both of which are relevant to the analysis below, then provided:

(a) In addition to the jurisdiction specified in Subtitle 8 of this title, the court has exclusive original jurisdiction over:
   (1) A child who is alleged to be delinquent or in need of supervision or who has received a citation for a violation;
   (2) Except as provided in subsection (d)(6) of this section, a peace order proceeding in which the respondent is a child; and
   (3) Proceedings arising under the Interstate Compact on Juveniles.

\*\*\*

(d) The court does not have jurisdiction over:
   (1) A child at least 14 years old alleged to have done an act that, if committed by an adult, would be a crime punishable by life imprisonment, as well as all other charges against the child arising out of the same incident, unless an order removing the proceeding to the court has been filed under § 4-202 of the Criminal Procedure Article;
   (2) A child at least 16 years old alleged to have done an act in violation of any provision of the Transportation Article or other traffic law or ordinance, except an act that prescribes a penalty of incarceration;
   (3) A child at least 16 years old alleged to have done an act in violation of any provision of law, rule, or regulation governing the use or operation of a boat, except an act that prescribes a penalty of incarceration;
   (4) A child at least 16 years old alleged to have committed any of the following crimes, as well as all other charges against the child

6

arising out of the same incident, unless an order removing the proceeding to the court has been filed under § 4-202 of the Criminal Procedure Article:

\*\*\*

(5) A child who previously has been convicted as an adult of a felony and is subsequently alleged to have committed an act that would be a felony if committed by an adult, unless an order removing the proceeding to the court has been filed under § 4-202 of the Criminal Procedure Article; or

(6) A peace order proceeding in which the victim, as defined in § 3-8A-01(cc)(1)(ii) of this subtitle, is a person eligible for relief, as defined in § 4-501 of the Family Law Article.

CJ § 3-8A-03 (2020 Repl. Vol.).

Thus, in the pre-JJRA version of CJ § 3-8A-03, subsection (a) identified the universe of cases over which "the [juvenile] court has exclusive original jurisdiction" and subsection (d) described the class of cases over which "[t]he [juvenile] court does not have jurisdiction[.]" This "has exclusive jurisdiction"/"does not have jurisdiction" structural framework can be traced back to 1969. Md. Code Ann., art. 26 § 70-2(a), (d) (1968 Repl. Vol., 1969 Cum. Supp.). As used in subsection (d), the phrase "does not have jurisdiction" has historically played a passive, jurisdiction-defining role.

The General Assembly worked within that existing structure when it amended section 3-8A-03 in the JJRA. Subsection (a) was amended to state that the juvenile court *has* exclusive jurisdiction over children at least 13 years old, subsection (d)(7) was amended to include children under the age of 13 in the list of cases over which the court lacks jurisdiction, and the new subsection—subsection (f)—was added to close the loop by

7

barring the State from criminally charging children under the age of 13. CJ § 3-8A-03

(2020 Repl. Vol., 2022 Supp.).[4]

Because these provisions were intended to work in harmony, it is useful to look at

them together:

> (a) In addition to the jurisdiction specified in Subtitle 8 of this title, the
> court has exclusive original jurisdiction over:
>> (1) A child:
>>> (i)   Who is at least 13 years old alleged to be delinquent; or
>>> (ii)  Except as provided in subsection (d) of this section, who is
>>> at least 10 years old alleged to have committed an act:
>>>> 1.  That, if committed by an adult, would constitute a
>>>> crime of violence, as defined in § 14-101 of the
>>>> Criminal Law Article; or
>>>> 2.  Arising out of the same incident as an act listed in
>>>> item 1 of this item;
>
> \*\*\*
>
> (d) The [juvenile] court does not have jurisdiction over:
>
> \*\*\*
>
>> (7)  Except as provided in subsection (a)(1)(ii) of this section, a
>> delinquency proceeding against a child who is under the age of 13
>> years.
>
> \*\*\*

---

[4] In CJ § 3-8A-03(d), the introductory phrase "does not have jurisdiction" applies in subsection (7) to delinquency proceedings against those children under the age of 13 who are not subject to the juvenile court's jurisdiction under subsection (a)(1)(ii). Subsection (a)(1)(ii), in turn, confers jurisdiction in the juvenile court over children at least 10 years old "alleged to have committed an act . . . [t]hat, if committed by an adult, would constitute a crime of violence, as defined in § 14-101 of the Criminal Law Article." For the sake of simplicity and brevity, when I refer to "children under the age of 13," use a similar phrase to the same effect, or refer more generically to "a child" in the context of discussing subsection (d)(7), I am referring to those for whom the exception under subsection (d)(7) does *not* apply. Thus, I will not repeat the exception each time I reference or discuss this provision.

(f) A child under the age of 13 years may not be charged with a crime.

*Id.*

### *The Majority's Interpretation*

In concluding that the JJRA divested the juvenile court of jurisdiction, the Majority relies on the plain meaning of "does not have jurisdiction" in the introductory clause of subsection (d). Under this interpretation, the fact that the juvenile court properly acquired jurisdiction before the JJRA went into effect is not relevant. Rather, the moment the JJRA took effect on June 1, 2022, the prefatory phrase "does not have jurisdiction" sprang into action and divested the juvenile court of jurisdiction. As noted above, the Majority reasons that "[n]othing in the JJRA provides that its change in the juvenile court jurisdiction does not apply to pending cases." Maj. Op. at 35.

Viewed in isolation, the Majority's interpretation of "does not have jurisdiction," as it applies to subsection (d)(7), is reasonable. After all, as amended by the JJRA, subsection (a)(1) already provides that the juvenile court has jurisdiction *over* children of at least 13 years of age. As a court of limited jurisdiction, if the statute does not affirmatively confer jurisdiction in the juvenile court, then jurisdiction does not lie in that court. Thus subsection (d)(7) was unnecessary if its only purpose was forward-looking. The Majority's interpretation, therefore, finds support in our long-standing preference to avoid interpretations that render provisions superfluous. *See Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 379 (2022).

Even so, "[j]ust as in the science of Physics every action has an equal and opposite reaction, so it seems that every canon of statutory construction has an equal and opposite canon." *Kaczorowski v. Mayor and City Council of Balt.*, 309 Md. 505, 512 (1987). Here, one such canon is that courts do not interpret statutory provisions in a vacuum or isolation. *See State v. Bey*, 452 Md. 255, 266 (2017) (citing *State v. Johnson*, 415 Md. 413, 421-22 (2010)). "We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Lockshin v. Semsker*, 412 Md. 257, 276 (2010).

In my view, the question is not what the plain language of the phrase "does not have jurisdiction" means. The issue, rather, is whether subsection (d)(7) came with a temporal limitation to its applicability. If it applies to a delinquency proceeding initiated before the JJRA took effect, then the Majority's "here today, gone tomorrow" interpretation would be correct. But if it does not, then the Majority's interpretation would be incorrect. The phrase "does not have jurisdiction" as used in subsection (d) does not expressly address that question. Nor does the provision establishing June 1, 2022, as an effective date for the JJRA answer the question. *See Landgraf v. USI Film Products*, 511 U.S. 244, 257 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

But the General Assembly was not working from a blank slate when it enacted the JJRA. The Juvenile Causes Statute was first enacted in 1945, Md. Code Ann., art. 26 § 48C (1947 Cum. Supp.), and since then, has been amended over 45 times. The General

10

Assembly had the benefit of caselaw interpreting its provisions and developing the principles for determining whether a statute applies retroactively. As explained below, such cases compel the conclusion that the General Assembly did not intend for the jurisdictional changes to section 3-8A-03 to apply to pending cases.

### *CJ § 3-8A-07(a) and* **Parojinog v. State**

The Majority focuses on CJ § 3-8A-03(d)(7) and gives short shrift to a different section of the statute with obvious relevance to the juvenile court's jurisdiction—CJ § 3-8A-07(a):

> If the [juvenile] court obtains jurisdiction over a child under this subtitle, that jurisdiction continues until that person reaches 21 years of age unless terminated sooner.

Its plain language reveals three parts: a condition, a rule, and an exception to the rule. The condition is "[i]f the juvenile court obtains jurisdiction over a child under this subtitle[.]" When the General Assembly chose those words, it knew that over time, it could amend the statute to enlarge or shrink the scope of the juvenile court's jurisdiction. Yet in defining this condition, what mattered was *that* the juvenile court acquired jurisdiction, not *when*. This remained the case when the General Assembly enacted the JJRA, which changed not one word in subsection 3-8A-07(a). Because the juvenile court obtained jurisdiction over M.P. when the delinquency petition was filed on May 5, 2022, that condition was satisfied here.

The *rule* under this subsection is that once such jurisdiction is obtained, "that jurisdiction continues" until the child turns 21. Again, this rule has never depended on

11

when or under which version of the statute the juvenile court acquired jurisdiction. Under that rule, the juvenile court still has jurisdiction over M.P.

The exception under subsection 3-8A-07(a) is if the juvenile court's jurisdiction is "terminated sooner." Unless that exception applies, the Majority's interpretation collapses under the weight of CJ § 3-8A-07(a). The question, therefore, is whether "does not have jurisdiction" in the introductory phrase of subsection 3-8A-03(d) and subpart (7) operate as a *termination* of jurisdiction under subsection 3-8A-07(a). In making this determination, we must keep in mind that sections 3-8A-03 and 3-8A-07(a) are meant to work together. The former tells us if the juvenile court has jurisdiction; the latter tells us when such jurisdiction ends.

The phrase "does not have jurisdiction" has a passive, definitional connotation. Indeed, as noted above, that is precisely how that phrase was used before the JJRA—section 3-8A-03 defined the scope of the juvenile court's jurisdiction with the "has exclusive jurisdiction"/"does not have jurisdiction" structure of subsections (a) and (d). The General Assembly drafted these provisions knowing that they would be applied by lawyers and non-lawyers alike. Thus, for example, when intake officers carried out their duty to "make an inquiry... as to whether the [juvenile] court *has jurisdiction*," as required under CJ § 3-8A-10(c)(1) (emphasis added), they did so by consulting the provisions of section 3-8A-03. If the facts appeared to support jurisdiction under subsection (a), the intake officers would know to consult subsection (d) to make sure such jurisdiction was not excluded thereunder.

12

The JJRA changed none of that. Section 3-8A-03 continues to use the same definitional structure in subsections (a) and (d), and intake officers continue to be required under CJ § 3-8A-10(c)(1) to consult those provisions when investigating a case to determine whether the juvenile court has jurisdiction. When it enacted the JJRA, the General Assembly knew that section 3-8A-07(a) would still *expressly* state that jurisdiction would continue "unless terminated sooner." The Majority shrugs off this provision because it does not preclude a termination "by operation of law." Maj. Op. at 39. True enough. But the moment the JJRA went into effect, subsection 3-8A-07(a) was also in effect and, by its plain terms, applied to *all* pending cases, including M.P.'s. So, with subsection 3-8A-07(a) firmly in place and unchanged by the JJRA, it seems unlikely that the General Assembly intended to countermand its effect on pending cases without expressly saying so. Nor do I think the General Assembly would have assumed that intake officers and courts would divine such intent from the introductory phrase to subsection (d)—"does not have jurisdiction"—which had been in the statute for decades and had played only a passive, definitional role, not a jurisdiction-terminating role.

We have precedent to guide us. In *Parojinog v. State*, 282 Md. 256, 264-65 (1978), this Court held that an amendment to a jurisdiction-defining provision—indeed, one that curtailed the juvenile court's jurisdiction—did *not*, under what is now CJ § 3-8A-07(a), terminate jurisdiction for delinquency petitions filed *before* the amendment's effective date. *Parojinog* involved allegations that a 17-year-old committed arson and related misdeeds. 282 Md. at 257-58. By the time the State filed the delinquency petition in May 1975, the child had turned 18. *Id.* at 258. Subsequently, on July 1, 1975, an amendment

13

narrowing the juvenile court's jurisdiction went into effect. *Id.* at 264. Chapter 554 of the Acts of 1975 said that effective July 1, 1975, "the juvenile court 'has exclusive original jurisdiction, but only for the purpose of waiving it, over an adult... who is alleged to have committed a delinquent act while a child.'" *Id.* At that time, a person at least 18 years of age was defined as an adult. CJ § 3-801(c) (1974). Thus, the defendant was a child when he allegedly committed the underlying acts and an adult when the amendment went into effect.

After the amendment went into effect but *before* the adjudication hearing, the juvenile court ordered the defendant to, among other things, pay restitution. 282 Md. at 258-59. Months later, the juvenile court waived jurisdiction, prompting the State to file an indictment in the circuit court based on the same alleged acts of arson. *Id.* at 259. Pointing to the penal effect of the post-amendment restitution order, the defendant advanced a double jeopardy defense in a motion to dismiss the indictments. *Id.* at 259-60. This circuit court denied the motion and the Appellate Court of Maryland affirmed. *Id.* This Court granted the defendant's petition for a writ of certiorari. *Id.* at 260.

The State argued that when the jurisdictional changes under Chapter 554 of the Acts of 1975 went into effect, the court was divested of jurisdiction to take *any* action other than to waive jurisdiction or dismiss the case, which meant that the juvenile court did not have jurisdiction when it ordered restitution. *Id.* at 264-65. And, without jurisdiction to "make an adjudication and disposition" of the case, jeopardy did not attach. *Id.* at 265. Thus, the State urged the Court to adopt the same "here today, gone tomorrow" approach adopted by the Majority today.

14

Only in *Parojinog*, this Court was not persuaded by that argument. We first identified the "fallacy in the State's argument" by observing that the delinquency petition was filed *before* the amendment went into effect. *Id.* We stated that the petition's filing date, not the adjudication date, "determines the jurisdiction of the juvenile court and the applicability of Ch. 554."[5] *Id.* We then turned to CJ § 3-806(a) (1974, 1977 Cum. Supp.), the predecessor to today's § 3-8A-07(a), which, as noted above, states that if the juvenile court obtains jurisdiction over a child under this subtitle, "that jurisdiction continues until that person[] reaches 21 years of age unless terminated sooner." *Parojinog*, 282 Md. at 260 (quoting to CJ § 3-806(a) (1974, 1977 Cum. Supp.)). Applying that provision, we reasoned that "[o]nce the juvenile court's jurisdiction attaches upon the filing of a petition, that jurisdiction continues until the defendant is 21 years of age unless **the court terminates** its jurisdiction sooner[.]" *Id.* at 265 (emphasis added). We held that "[c]onsequently, the juvenile court was not divested by Ch. 554 of jurisdiction to make an adjudication and disposition regarding the defendant." *Id.* Thus, we concluded, that jeopardy did attach and the defendant was entitled to a dismissal of the indictments. *Id.* at 265-66.

None of the relevant legal principles have changed since *Parojinog* was decided. Then, as now, the juvenile court acquired jurisdiction when the delinquency petition was filed—which, in both cases was *before* the jurisdiction-altering amendment went into effect. *Id.* at 260. Then, as now, the statute said that "the age of the person at the time the

---

[5] For that proposition, we cited two then-recent cases, *In re Appeal No. 1038*, 32 Md. App. 239, 243 (1976) and *In re Appeals No. 1022 and 1081*, 278 Md. 174, 179-80 (1976). Thus, *Parojinog* was not an outlier.

15

alleged delinquent act was committed controls the determination of jurisdiction."[6] *Id.* at 260 (citation omitted) (quoting CJ § 3-805(a) (1974, 1977 Cum. Supp.)); CJ § 3-8A-05(a) (2020 Repl. Vol., 2023 Supp.). And then, as now, the statute provided that "jurisdiction continues until that person[] reaches 21 years of age unless terminated sooner." *Parojinog*, 282 Md. at 260 (citation omitted) (quoting CJ § 3-806(a) (1974, 1977 Cum. Supp.)); *see also* CJ § 3-8A-07(a) (2020 Repl. Vol., 2023 Supp.).[7] Moreover, since deciding *Parojinog*, this Court has reiterated that, under what is now section 3-8A-07(a),

---

[6] The Majority does not attempt to distinguish *Parojinog* on either the law or the facts. Instead, the Majority states: "Parojinog and the cases cited in it endorse the principle set forth in CJ § 3-8A-05(a), that the age of the child at the time that the alleged delinquent act was committed controls the determination of the jurisdiction of the juvenile court." Maj. Op. at 37. That's true, and I have not suggested otherwise. It's also not the take-away from *Parojinog*. *Parojinog* teaches that a jurisdiction altering amendment does *not* apply to pending cases. The Majority side steps *that* part of *Parojinog*.

[7] Although the Majority has not attempted to do so, one might try to distinguish *Parojinog* from the present case by focusing on the differences in the phrasing of the two amendments. In *Parojinog*, the amendment was framed in the affirmative—"[t]he court *has* exclusive original jurisdiction, but only for the purpose of waiving it, . . . ." 1975 Md. Laws, ch. 554 (emphasis added). Here, in contrast, § 3-8A-03(d)(7) (2020 Repl. Vol., 2022 Supp.) was framed in the negative—"The court *does not* have jurisdiction over . . . [e]xcept as provided in subsection (a)(1)(ii) . . . a delinquency proceeding against a child who is under the age of 13 years." These structural distinctions are without a substantive difference. The amendment in *Parinojog* could just as easily be reframed in the image of § 3-8A-03(d)(7), without changing its meaning, by stating "except for the sole purpose of waiving it, the juvenile court *does not* have jurisdiction over . . . ." Conversely, § 3-8A-03(d)(7) could be rewritten to mirror the format of the amendment in *Parajinog*, again without changing its meaning, to say that "the court *has* jurisdiction over a delinquency petition against a child under the age of 13 years, but only as provided in. . . ." The difference between the wording of the two amendments, therefore, is a matter of drafting style, not substance, and provides no basis to distinguish *Parojinog* from the present case.

16

"jurisdiction, once acquired, terminates (with some exceptions not here pertinent) only if the juvenile court so orders." *In re Valerie H.*, 310 Md. 113, 117 (1987).[8]

This Court recently emphasized the importance of crediting the General Assembly with awareness "of this Court's interpretations of statutes." *Bellard v. State*, 452 Md. 467, 494-95 (2017). Indeed, in the absence of a "clear intention to abrogate" prior holdings, we presume legislative *acquiescence* as well. *Id.* (quoting *Allen v. State*, 402 Md. 59, 72 (2007)). In *Parajinog*, we held that the filing date of the delinquency petition was the relevant date for determining the applicability of the jurisdiction-narrowing amendment and that the "terminated sooner" exception to CJ § 3-8A-07(a) was not triggered by such amendment. 282 Md. at 264-65. In *In re Valerie H.*, we confirmed that the "terminated sooner" exception is triggered "only" by a court order. 310 Md. at 117. If the General Assembly had intended to abrogate *Parojinog* or *In re Valerie H.*, it would have said so explicitly.[9]

---

[8] The Majority is correct that *In re Valerie H.* involved a child in need of assistance case ("CINA"), but is incorrect that that distinction matters here. When *In re Valerie H.* was decided, the "terminated sooner" provision applied to both CINA and delinquency cases. It *still* applies to delinquency cases, but not to CINA cases. If anything, that it no longer applies to the latter shows that the General Assembly consciously chose to keep that provision in place for the former. And, it did so with full knowledge of our decisions in *Parojinog* and *In re Valerie H.*, thus presumably the General Assembly had no intention to abrogate either decision.

[9] For example, the General Assembly could have easily added the phrase "pending before, on, or after the effective date" to § 3-8A-03(d)(7) in the following manner: "The court does not have jurisdiction over . . . a delinquency proceeding [, pending or filed before, on, or after the effective date,] against a child who is under the age of 13 years."

17

Thus, the Majority misses the point in stating that "[n]othing in the JJRA provides that its change in the juvenile court jurisdiction does *not* apply to pending cases." Maj. Op. at 35 (emphasis added). Indeed, the Majority has it backward: The General Assembly's *failure* to include such language or to otherwise "express a clear intention to abrogate" *Parojinog* or *In re Valerie H.* should be presumed intentional and as acquiescence to our prior interpretation of the "terminated sooner" exception. *See Bellard*, 452 Md. at 495.

I would therefore hold that the JJRA did not divest the juvenile court of jurisdiction over any case for which jurisdiction properly attached before the effective date of the JJRA.

### *The General Savings Statute*

Even without CJ § 3-8A-07(a), the same result is reached through the application of Maryland's general savings statute:

(a) Except as otherwise expressly provided, the repeal, repeal and reenactment, or amendment of a statute does not release, extinguish, or alter a criminal or civil penalty, forfeiture, or liability imposed or incurred under the statute.

(b) A repealed, repealed and reenacted, or amended statute shall remain in effect for the purpose of sustaining any:
    (1) criminal or civil action, suit, proceeding, or prosecution for the enforcement of a penalty, forfeiture, or liability; and
    (2) judgment, decree, or order that imposes, inflicts, or declares the penalty, forfeiture, or liability.

GP § 1-205 (2019 Repl. Vol.).

Here, the relevant part of this statute is subsection (b)(1). Under its plain language, the statute vesting the juvenile court with jurisdiction—the pre-JJRA version of CJ § 3-8A-03(a)(1)—"remain[ed] in effect for the purpose of sustaining" the delinquency

18

proceeding against M.P. Thus, M.P. is not entitled to a dismissal of the delinquency petition.

<em>State v. Clifton</em>

The case of *State v. Clifton*, 177 Md. 572 (1940), provides a helpful discussion of the general savings statute and supports its application here. There, the defendant was indicted under a state statute for selling alcoholic beverages without a license. *Id.* at 574. Several months after the indictment, an amendment of the statute went into effect. *Id.* (citing 1939 Md. Laws, ch. 775). The amended statute repealed the specific section under which the defendant had been indicted, but in its place, enacted a new section that provided for the same penalty for the same underlying act. *Id.* Citing the repeal of the statute under which he had been indicted, the defendant moved to quash his indictment. The trial court granted the motion based on the common law rule that "after a statute creating a crime has been repealed no punishment can be imposed for any violation of it committed while it was in force." *Id.*

This Court reversed. *Id.* In doing so, we recognized the "fundamental principle that the law does not favor repeals by implication." *Id.* We observed that there was "no indication in its language that the Legislature intended to abolish" the crime of which the defendant was charged and that because "the amended statute contains substantially the same provisions as the original, the continuity of the original as to those provisions is not affected." *Id.* at 575. Thus, we concluded, that the "continuity of the original [statute] as to those provisions is not affected." *Id.* That was the primary basis on which we reversed the trial court. Now to the part of *Clifton* that is relevant here.

19

We then determined that the same result would be reached even if the General Assembly had "absolutely repealed" the statute without replacing it with a substantively identical counterpart. *Id.* That's because "the State could nevertheless prosecute the present case through the operation of the general saving statutes, which have been in force in Maryland since their enactment by the Legislature in 1912." *Id.* We referred to the part of the savings statute that

> provides that the repeal of any statute shall not have the effect of releasing or extinguishing "any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force *for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability*."

*Id.* (quoting 1912 Md. Laws, ch. 365) (emphasis added). Of particular importance here, we noted that the general savings statute "rescinded" the common law rule that would have prevented any further proceedings based on the repealed statute. *Id.* at 576.

Our analysis of the general savings statute included an observation about its origin—that it was copied from its federal counterpart. *Id.* at 575-76. We noted that "[t]he Federal saving clause has been held by the United States Supreme Court to save any prosecution for a pending violation committed during the time a statute was in force, even though the statute was repealed before the time of the trial." *Id.* at 576 (citing *United States v. Reisinger*, 128 U.S. 398 (1888)).[10] We concluded: "As the Alcoholic Beverages Act was

---

[10] Given our reliance on it in *Clifton*, *United States v. Reisinger* is also instructive. There, the defendant was indicted under a statute that made it a crime for an attorney to charge more than ten dollars in a pension case. 128 U.S. at 399-400. That statute, however, was repealed about a year before the indictment. *Id.* (citing Act of July 4, 1884, ch. 181,

20

not repealed, and even if it had been repealed the prosecution of the appellee would be saved by the general savings statutes, the Court below erred in quashing the indictment." *Id.* at 577. Although the format of Maryland's savings statute has changed since *Clifton*, its substance has remained the same. Thus, our analysis of the general savings statute in *Clifton* directly supports its application here.

In dismissing the general savings statute as "inapplicable," the Majority tries to distinguish *Clifton* from this case. But the Majority does not argue that a delinquency proceeding is not within the scope of subsection (b)(1) of the general savings statute. Nor does the Majority contend that the JJRA contains specific language that removes it from the reach of the general savings statute. Rather, the Majority declares, as if the proposition is self-evident, that:

> The scenario in Clifton is readily distinguishable from the JJRA's limiting jurisdiction in order to prevent children under the age of 13 years, with certain exceptions, from being subjected to juvenile delinquency proceedings. Put simply, Clifton does not support the applicability of the general saving clause to a law in which the General Assembly sought to avoid harm to young children by limiting their exposure to the juvenile system.

Maj. Op. at 44.

The Majority is entitled to its view that the public policy behind the JJRA is so important that it should not be subject to the general savings statute. But that is not our call to make. The *general* savings statute, by design, is meant to apply *generally* unless the General Assembly—not this Court—decides otherwise. In dismissing the general savings

---

23 Stat. 98). Because the alleged violation occurred before the statute's repeal, the Supreme Court of the United States held that the general savings statute sustained prosecutions based on events that took place before the statute was repealed. *Id.* at 401-02.

21

statute as inapplicable, the Majority resorts to a form of "because we said so" reasoning untethered to precedent or statutory text and grounded only in its view of the public policy animating the JJRA.

*State v. Johnson*

The Majority misapplies another case from this Court: *State v. Johnson*, 285 Md. 339 (1979). Quoting our opinion from *Johnson*, the Majority declares that "[o]ur precedent requires the outcome we reach because without 'a contrary expression of intent, a cause of action or remedy dependent upon a statute falls with the repeal of [the] statute.'" Maj. Op. at 40 (quoting *Johnson*, 285 Md. at 344). Thus, the Majority concludes:

> With no indication in the JJRA that the General Assembly intended for the changes to CJ § 3-8A-03 not to apply to pending cases, jurisdiction over the delinquency petition and proceeding fell with the repeal of the juvenile courts' jurisdiction over children charged with nonviolent conduct that occurred when they were under 13 years old.

Maj. Op. at 40-41 (footnote omitted).

The Majority draws the wrong lesson from *Johnson* and, once again, the wrong conclusion from the General Assembly's failure to indicate that the changes to section 3-8A-03 do not apply to pending cases. In *Johnson*, the defendant pleaded guilty to rape and was sentenced to five years' imprisonment, all suspended, and placed on probation for five years. 285 Md. at 340. He was subsequently convicted for an assault that he committed just two days after his sentencing, and he was then found guilty of violating his probation. *Id.* The trial court struck the suspension of his sentence and, believing the court's hands tied with no discretion, reinstated the five-year sentence. *Id.* at 340-41. While on appeal, the General Assembly amended the statute to give the trial court discretion to determine how

22

much of the suspended sentence should be reinstated. *Id.* at 341-43. The issue before this Court was whether the new sentencing statute should apply to Johnson. *Id.*

To show why the Majority is incorrect that "[o]ur precedent requires the outcome we reach[,]" Maj. Op. at 40, I will first summarize the Majority's analysis of *Johnson* that led to that conclusion. The Majority starts with the correct premise that the general rule is that "newly-enacted statutes generally apply prospectively, not retroactively." Maj. Op. at 31. The Majority quotes *Johnson* for the proposition that an exception to the general rule "is that a statute which affects a matter still in litigation when the statute becomes effective will be applied by a reviewing court even though the statute was not then law when the decision appealed from was handed down, unless the legislature expresses a contrary intent." Maj. Op. at 32 (quoting *Johnson*, 285 Md. at 343). The Majority then adopts this quote from *Johnson*: "Thus many courts adhere to the proposition that in the absence of a contrary expression of intent, a cause of action or remedy dependent upon a statute falls with the repeal of [the] statute." Maj. Op. at 32 (quoting *Johnson*, 285 Md. at 344). From these passages in *Johnson*, I see why the Majority concludes that "our precedent" requires the result it reaches today. Maj. Op. at 40.

But the Majority stops its analysis of *Johnson* too soon and ignores that we then recognized that the general savings statute *negates* the very exception that the Majority applies:

> Where penalties, rights or liabilities incurred or accrued under a prior version of a statute would otherwise be extinguished by its repeal, most legislatures have enacted general savings statutes which have the effect of continuing a repealed statute in force for the purpose of punishing offenses committed prior to repeal. Thus, a general savings statute preserves penalties imposed

23

under prior law except where a subsequent repealing act manifests the legislative intention to the contrary.

*Johnson*, 285 Md. at 344.

Thus, in *Johnson*, we applied the general savings statute to hold that the defendant was *not* entitled to the benefit of the more lenient sentencing statute. In reaching that conclusion, we observed that "nowhere" did the new statute "indicate that the Legislature intended to restrict operation of [the general savings statute]." *Id.* at 345. In other words, the takeaway from *Johnson* is that the general savings statute applies unless the General Assembly expressly states otherwise.

Indeed, relying on *Johnson*, we reiterated that point in *Graves* v. *State*, 364 Md. 329, 339 n.10 (2001):

> Ordinarily, a criminal defendant will not be entitled to a windfall from the amendment, revision, or repealing of a statute where the legislature altered the statute during the course of the litigation. *See State v. Johnson,* 285 Md. 339, 346, 402 A.2d 876, 880 (1979). Unless a statute specifically states an intent to the contrary, the provisions of Maryland's general savings clause, Code (1957, 1998 Repl. Vol.) Article 1, § 3, operate to uphold "any penalty, forfeiture or liability incurred under a statute which is subsequently repealed or amended." *See id.* at 345, 402 A.2d at 879.

So too here—nowhere does the JJRA say that it escapes application of the general savings statute.[11] In relying on the General Assembly's silence as confirmation of a contrary intention, the Majority has it backward.

---

[11] The part of the general savings statute at issue in *Johnson* was the penalty clause in GP § 1-205(a). As explained above, the provision relevant here is GP § 1-205(b), which applies to pending proceedings (as opposed to previously imposed penalties). But the same logic that drove the Court in *Johnson* applies here with equal force.

24

The Majority makes the same mistake with *Bruner v. United States*, 343 U.S. 112 (1952). The Majority quotes *Bruner* for the proposition that "when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law[.]" Maj. Op. at 33 (quoting *Bruner*, 343 U.S. at 116-17). Again the Majority misses the most relevant part.

*Bruner* involved a claim for overtime pay by a civilian fire chief who had been appointed by a local army commander under authority granted by the Secretary of War. 343 U.S. at 113. The plaintiff brought the action in 1948. The jurisdictional question before the Court traced its roots to 1887 when the district court's jurisdiction over claims below a certain amount was concurrent with the Court of Claims. *Id.* at 114. That changed in 1898 when Congress decided to "centraliz[e]" such cases in the Court of Claims for cases brought "for official services of officers of the United States[.]" *Id.* at 114-15. The plaintiff brought his claim in the district court, but the court dismissed the case because the plaintiff was an "officer of the United States" and therefore the Court of Claims had exclusive jurisdiction. *Id.* at 113. The Fifth Circuit affirmed. *Id.* Meanwhile, in a different case involving similar circumstances, the Sixth Circuit sustained jurisdiction because the civilian firefighter was a mere employee, not an "officer of the United States." *Id.* at 114 (citing *Beal v. United States*, 182 F.2d 565 (5th Cir. 1950)). So the two circuits split over whether the civilian firefighter was an employee or an officer. After the United States Supreme Court granted certiorari to *Bruner*, a jurisdictional amendment went into effect.

25

In 1951, Congress amended the statute to provide that the Court of Claims had exclusive jurisdiction over claims brought by employees *and* officers of the United States. *Id.* at 114. The issue before the Court was, therefore, whether that new statute applied to cases filed before the amendment went into effect. The Court observed that Congress had not excluded pending cases from the reach of the jurisdictional amendment. *Id.* at 115. And, as the Majority observes, the Court concluded that "when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law[.]" *Id.* at 116-17. This is a variation of the same exception that, in *Johnson*, yielded to Maryland's general savings statute.

Just as the Majority overlooked the relevance of the general savings statute in *Johnson*, so too it ignores the general saving statute in its analysis of *Bruner*. In the very next sentence after the language quoted by the Majority, the Court explained that Bruner's case was "not affected by the so-called general savings statute which provides that 'repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute.'" *Id.* at 117. The Court went on to explain that, in Bruner's case, "Congress has not altered the nature or validity of petitioner's rights or the Government's liability but has simply reduced the number of tribunals authorized to hear and determine such rights and liabilities." *Id.* In other words, because Bruner's substantive rights were not denied because he could still press his claim in a different tribunal, the Court declined to apply the general savings statute to save his district court proceeding. *Id.* Here, because the general savings statute *does* apply, *Bruner*'s application of the general exception does not support the Majority's conclusion.

26

*Landgraf v. USI Film Products*

The Majority's reliance on *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), is similarly misplaced. *Landgraf* involved an amendment to Title VII of the Civil Rights Act of 1964 conferring the right to recover compensatory and punitive damages and the right to a jury trial. The issue was whether the amendment applied retroactively and entitled the appellant to a remand for a jury trial on damages. *Id.* at 247-49. The Court declined to retroactively apply the amendment to the pending case. *Id.* at 280-86.

Although *Landgraf* was not about jurisdiction, the Majority still finds support in dicta discussing how a retroactivity analysis applies to statutes that alter a court's jurisdiction:

> We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. Thus, in *Bruner v. United States*, 343 U.S. 112, 116-117 (1952), relying on our "consisten[t]" practice, we ordered an action dismissed because the jurisdictional statute under which it had been (properly) filed was subsequently repealed. See also *Hallowell v. Commons*, 239 U.S. 506, 508-509, (1916); *Assessors v. Osbornes*, 9 Wall. 567, 575 (1870).

511 U.S. at 274 (footnote omitted); *see* Maj. Op. at 32, 40.

Observing that *Langraf* relied on *Bruner* in the above passage, the Majority then explains that this Court's "holding in <u>Johnson</u> parallels the rationale expressed by the Supreme Court of the United States in <u>Bruner</u>[,]" before adopting this quote from *Bruner*: "[W]hen a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law[.]" Maj. Op. at 41 (quoting *Bruner*, 343 U.S. at 116-17) (citation omitted).

27

Again, from these selected quotes, it is not difficult to understand why the Majority claims support from these cases for its conclusion that the JJRA divested the juvenile court's jurisdiction over M.P. But, as discussed above, in disregarding how the general savings statute figured into the Courts' analyses, the Majority draws the wrong lessons from *Johnson* and *Bruner*. Thus, the dicta from *Landgraf* quoted above does not support the Majority's conclusion.

The Majority misapplies *Landgraf* in another respect. The Majority acknowledges the general principle that retroactive application of statutes is disfavored. The Majority insists, however, that "[r]etroactive application of a jurisdictional amendment is not at issue because the jurisdictional question here concerns the authority of the juvenile court to take the action at issue subsequent to the effective date of the JJRA." Maj. Op. at 40. To support that proposition, the Majority stitches together two quotes from *Landgraf*: one from the Court's opinion and one from Justice Scalia's concurrence. The Majority states the following, with the quote attributed to Justice Scalia italicized for easy reference:

> The issue does not involve a question of retroactivity "merely because [CJ § 3-8A-03(d)(7)] is applied in a case arising from conduct antedating the statute's enactment[.]" Landgraf, 511 U.S. at 269 (citation omitted). When interpreting a jurisdictional statute, for purposes of retroactivity, the relevant event "*is the moment at which that power is sought to be exercised. Thus, applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively; but applying it to prevent any judicial action after the statute takes effect is applying it prospectively.*" Id. at 293 (Scalia, J., concurring in judgment).

Maj. Op. at 40 (emphasis added). From that proposition, the Majority concludes:

> In this case, M.P. does not seek to apply CJ § 3-8A-03 to any of the juvenile court's actions prior to June 1, 2022, but rather to prevent the court from

28

exercising jurisdiction over him after that date, when the juvenile court no longer possesses jurisdiction.

*Id.* at 40.

A close look at *Landgraf* reveals how the Majority went astray. In deciding not to apply the statute retroactively, the Court in *Landgraf* started with the premise that retroactive application of statutes is disfavored but observed that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." 511 U.S. at 268. The Court then embraced the test articulated by Justice Story: "the ban on retrospective legislation embraced 'all statutes, which, though operating only from their passage, affect vested rights and past transactions.'" *Id.* at 268-69 (citing *Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (Story, Circuit J., C.C.D.N.H. 1814)).

That was the context in which the Supreme Court stated that "[a] statute does not operate 'retrospectively' because it is applied in a case arising from conduct antedating the statute's enactment," *id.* at 269, on which the Majority relies. But in highlighting the difficulty of knowing when the rule against retroactive application applies, the Court was emphasizing that it is not enough that the statute applies to conduct pre-dating the statute. In the next sentence, the Court offered its formulation modeled after Justice Story's vested rights approach, stating that, "[r]ather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269-70. The Majority skips that part.

The Majority instead jumps to Justice Scalia's concurrence—specifically the passage italicized above—to advance a different formulation. But the Majority overlooks

the context in which Justice Scalia wrote those words. Notice in the above passage that the Majority picks up Justice Scalia's statement in the middle of his sentence with "is the moment at which that power is sought to be exercised." Maj. Op. at 40 (quoting *Landgraf*, 511 U.S. at 293 (Scalia, J., concurring)). That statement came in one of the later paragraphs of Justice Scalia's concurrence in which he expresses his "disagreement with the Court's analysis of... the meaning of retroactivity." *Landgraf*, 511 U.S. at 290.

Justice Scalia disagreed with the Court's adoption of the "vested rights" test articulated by Justice Story and thought it was a mistake to use the vested rights approach to explain the Court's prior decisions, particularly *Bruner* and *Hallowell*, in which jurisdiction-eliminating statutes were applied to pending cases. *Id.* at 292-93. Justice Scalia was referring to the Court's explanation that applying such statutes "takes away no substantive right but simply changes the tribunal that is to hear the case."[12] *Id.* at 274 ((Majority opinion) (quoting *Hallowell*, 239 U.S. at 508)). Justice Scalia responded that such an explanation only worked in some cases, noting that sometimes the jurisdictional amendment would deprive the claimant of *any* forum in which to pursue the claim.[13] *Id.*

---

[12] That such statutes only change the tribunal without taking away substantive rights was why the Court, in *Bruner*, declined to apply the general savings statute. 343 U.S. at 117.

[13] Interestingly, Justice Scalia's example for that proposition was the Portal-to-Portal Act of 1947." *Landgraf*, 511 U.S. at 292-93 (Scalia, J., concurring). That statute, however, contains a provision that expressly divested the courts of jurisdiction over pending cases. 29 U.S.C. § 252(d). Specifically, that statute states that

> [n]o court of the United States, of any State, Territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any

30

at 292-93 (Scalia, J., concurring). Justice Scalia proposed a different explanation for the Court's prior jurisdiction cases, the italicized part of which is the segment quoted by the Majority:

> Our jurisdiction cases are explained, I think, by the fact that the purpose of provisions conferring or eliminating jurisdiction is to permit or forbid the exercise of judicial power—so that the relevant event for retroactivity purposes *is the moment at which that power is sought to be exercised. Thus, applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively; but applying it to prevent any judicial action after the statute takes effect is applying it prospectively*.

*Id*. at 293 (emphasis added); *see* Maj. Op. at 40.

Thus, because he disagreed with the Court that the vested rights test explained the Court's prior jurisprudence, Justice Scalia was merely offering an alternative rationale for the Court's prior decisions; he was not announcing a new test on behalf of the Court for determining when the rule against retroactive application would apply. And, beyond *Bruner*, which does not support the Majority's holding for the reasons explained above, all but one of the cases cited by Justice Scalia show that he was referring to cases involving

---

action or proceeding, *whether instituted prior to or after the date of the enactment of this Act*, to enforce liability or impose punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, under the Walsh-Healey Act, or under the Bacon-Davis Act, to the extent that such action or proceeding seeks to enforce any liability or impose any punishment with respect to an activity which was not compensable under subsections (a) and (b) of this section.

*Id.* (emphasis added).

31

statutes that *expressly* applied the jurisdictional changes to pending cases.[14] Here, as the

Majority acknowledges, the General Assembly included no such language.[15] *Landgraf*,

therefore, is of little analytical value here.

---

[14] Justice Scalia cited to *Hallowell v. Commons*, 239 U.S. 506, 508 (1916), which, like *Bruner*, divested jurisdiction in federal court but granted jurisdiction to a different tribunal, such that no substantive rights were deprived. Thus, *Hallowell* is not relevant here for the same reason as *Bruner*—that a general savings statute applies.

Justice Scalia also cited *Ex parte McCardle*, 74 U.S. (7 Wall.) 506 (1869), and *Insurance Co. v. Ritchie*, 72 U.S. (5 Wall.) 541 (1867), both of which involved an express repeal of a prior law that had previously granted jurisdiction to federal courts. *See McCardle*, 74 U.S. at 512-14; *Insurance Co.*, 72 U.S. at 544-45. The statutes at issue in *McCardle* and *Ritchie* were enacted for the *express purpose* of removing jurisdiction granted by prior law, and both expressly stated that the court did not maintain jurisdiction over pending cases. *See* Act of Mar. 27, 1868, ch. 34, § 2, 15 Stat. 44 (the statute in *McCardle*, which stated that "the exercise of any such jurisdiction by said Supreme Court on appeals *which have been* or may hereafter be taken, be, and the same is, hereby repealed" (emphasis added)); Acts of July 13, 1866, ch. 184, § 68, 14 Stat. 98, 172 (the statute in *Ritchie*, which stated that "any case *which may have been removed* from the courts of any State under said fiftieth section to the courts of the United States shall be remanded to the State court from which it was so removed" (emphasis added)).

The other case cited by Justice Scalia, *King v. Justices of the Peace for the City of London* (1764) 97 Eng. Rep. 924 (KB), likewise involves a law enacted with the express purpose of removing jurisdiction granted by prior law. *See* 97 Eng. Rep. at 925.

[15] The Majority's reliance on Justice Scalia's critique of the vested rights test is ironic given that the vested rights test is firmly entrenched in Maryland's jurisprudence. *See Est. of Zimmerman v. Blatter*, 458 Md. 698, 728-29 (2018). In *Estate of Zimmerman*, we stated:

> Although statutes are presumed to apply prospectively, there are two exceptions to that presumption, namely: (1) statutes that apply to procedural changes, because a statute effecting a change in procedure only, and not in substantive rights, ordinarily applies to all actions, whether accrued, pending, or future, unless a contrary intention is expressed; and (2) statutes that have remedial effect and do not impair vested rights.

*Id.* (cleaned up).

The Majority contends that its

> conclusion is also consistent with our holding in <u>Waker [v. State</u>, 431 Md. 1 (2013)] and a long line of precedent providing that, where a statute is amended or repealed "after an alleged offense or after an event giving rise to some alleged liability, a court, including an appellate court, would generally apply the law as it existed when the court was considering the case and not the law in effect when the alleged offense or event occurred."

Maj. Op. at 41 (quoting *Waker*, 431 Md. at 9-10). But in that statement from *Waker*, we were simply describing the common law rule. In the next sentence, we gave the general saving clause its due: "The general saving clause, quoted above, modified the common law principle in some types of cases." *Waker*, 431 Md. at 10. In *Waker*, the amendment went into effect before Waker's trial, thus, we concluded that, unlike in *Johnson*, the penalty clause of the general savings statute did not apply. *Id.* at 11. So, in *Waker*, unlike in *Johnson*, the common law rule prevailed because the general savings statute did *not* apply. Here, the general savings statute *does* apply, so the common law rule that the Majority relies on *does not* apply.

### *Problematic Consequences of the Majority's Interpretation*

There are practical reasons to conclude that the General Assembly did not intend for the JJRA's jurisdictional changes to apply to pending cases. When the General Assembly enacted the JJRA, it understood that the juvenile delinquency system had been operating for decades and that many children were already in the system in various stages—both pre-adjudication and post-disposition. The General Assembly had to draw the line somewhere in determining how the jurisdictional changes would be applied. The case

for the rule established in *Parojinog* becomes even stronger when the ramifications of the

Majority's interpretation are considered.

Although the JJRA was enacted on April 9, 2022, it was in the works since the

beginning of the 2022 legislative session, when it was first read in the House of Delegates

on January 20.[16] The General Assembly knew when it enacted the JJRA on April 9, 2022,

that there would be 53 days before *any* of its provisions would go into effect. The General

Assembly would have assumed that during that interim, the juvenile justice system would

continue its operations uninterruptedly; that every person involved in the system would

continue to carry out their duties mandated by the *existing statute*. Thus, if the General

Assembly intended to apply the jurisdictional changes to pending cases, it had a practical

reason to express its intention clearly and unambiguously—to minimize the waste of time

and money spent on efforts that would soon be rendered worthless. The timeline of M.P.'s

case illustrates why this is so.

Although the juvenile court's jurisdiction attaches upon the filing of a delinquency

petition, the petition is the culmination of significant legwork by others, starting with the

---

[16] The bill for the JJRA was introduced as House Bill 459 and Senate Bill 691 during the 2022 session. The House of Delegates voted in favor of House Bill 459 on February 25, and the Senate voted in favor of Senate Bill 691 on March 21. The House voted again to pass and enroll the bill after the Senate's consideration on April 1. It was enacted without Governor Hogan's signature on April 9, 2022, and it became effective on June 1 of that year.

"intake officer."[17] The intake officer's work begins upon receipt of a "[c]omplaint[] from a person or agency having knowledge of facts which may cause a person to be subject to the jurisdiction of the court under [subtitle 8A]." CJ § 3-8A-10(b)(1) (2020 Repl. Vol., 2023 Supp.). Within 25 days, the intake officer "shall" both investigate whether the juvenile court has jurisdiction and if so, determine whether "judicial action is in the best interests of the public or the child." *Id.* § 3-8A-10(c). Within the same 25 days, the intake officer may take one of three courses of action: "(i) Authorize the filing of a petition or a peace order request or both; (ii) Propose an informal adjustment of the matter; or (iii) Refuse authorization to file a petition or a peace order request or both." *Id.* § 3-8A-10(c)(3). The intake officer can choose the first option—authorize the filing of a delinquency petition—if "the intake officer concludes that the court has jurisdiction over the matter and that judicial action is in the best interests of the public or the child." *Id.* § 3-8A-10(d)(1).[18]

---

[17] An intake officer is the "person assigned to the court by the Department of Juvenile Services to provide the intake services set forth in" title 3, subtitle 8A of the Courts and Judicial Proceedings Article. CJ § 3-8A-01(r) (2020 Repl. Vol., 2023 Supp.).

[18] The intake officer can choose that route upon determining that the juvenile court has jurisdiction but that the best interests of the child or the public would better be served with an informal adjustment. CJ § 3-8A-10(e). That option requires the consent of the child and the child's parent or guardian, and when pursued, must be completed within 90 days unless extended by the court. *Id.* § 3-8A-10(e)(3), (f). And, if the intake officer later determines that the informal adjustment process isn't working, then the intake officer must decide whether to authorize or refuse to authorize the filing of a petition. CJ § 3-8A-10(f)(4). Thus, had the intake officer chosen an informal adjustment for M.P., under the Majority's theory, M.P. would have had no incentive to cooperate because a delinquency petition filed before June 1, 2022 would have to be dismissed. When the General Assembly enacted the JJRA on April 9, 2022, it is hard to imagine that it intended such wasteful and fruitless efforts with respect to cases already in the pipeline.

Here, M.P. allegedly committed the delinquent acts in mid-March 2022—before the JJRA was enacted. The intake officer received the complaint on March 21, 2022. The 25-day period under CJ § 3-8A-10(b) and (c) began on March 21 and ended on April 15, straddling the April 9 enactment of the JJRA. Within that 25-day window, the intake officer determined that the juvenile court *did* have jurisdiction over M.P. and that judicial action *did* serve either M.P.'s or the public's best interests. Thus, on April 11, just two days after the JJRA was enacted and with just four days to spare before the 25-day window closed, the intake officer authorized the State's Attorney to file a delinquency petition against M.P.

Once the intake officer authorizes the filing of a delinquency petition, the ball is in the State's Attorney's court. Section 3-8A-13(b) provides that delinquency petitions "shall be prepared and filed by the State's Attorney." Further, "[a] petition alleging delinquency shall be filed within 30 days after the receipt of a referral from the intake officer, unless that time is extended by the court for good cause shown." CJ § 3-8A-13(b). Here, as required by statute, the State's Attorney prepared and filed the delinquency petition against M.P. on May 5, 2022.

To accept the Majority's interpretation, we must assume that the General Assembly intended that, in the 53 days before the JJRA would take effect: (1) intake officers would continue to determine whether the juvenile court had jurisdiction over children under the age of 13 and whether a delinquency petition would serve the child's or the public's interest; (2) State's Attorneys would, as required by statute, continue to timely file delinquency petitions when authorized by the intake officer; (3) court personnel would

36

continue to docket such cases and open files; and (4) the juvenile court would acquire jurisdiction for a brief period. All of this, only to abruptly lose jurisdiction on June 1, 2022.

If the General Assembly intended this result, it would have made its intentions known through explicit language so that time and money would not be wasted on matters that would have to be dismissed. Indeed, it is hard to imagine why the General Assembly would have intended to put a child through the ordeal of being charged with delinquent acts if it intended that such charges would soon be summarily dismissed.[19]

There are other anomalous consequences to the Majority's interpretation. The *thing* excluded from the juvenile court's jurisdiction under subsection (d)(7) is a "delinquency proceeding." Notice the singular form in the phrase "*a* delinquency proceeding." (Emphasis added). Although "delinquency proceeding" is not defined in the statute, the General Assembly was not working from a blank slate. Indeed, on November 9, 2021, this Court adopted Title 11, Chapter 400 of the Maryland Rules of Court—dedicated solely to "delinquency and citation proceedings." Md. Rule 11-401 ("The Rules in this Chapter govern delinquency and citation proceedings[.]").

---

[19] If the General Assembly had intended the jurisdictional changes to apply to pending cases, it could have minimized such wasted efforts by making the JJRA effective immediately, which it had the votes to do. For a bill to be enacted and effective immediately as emergency legislation, it must be "supported by three-fifths [60%] of all the members elected to each of the two Houses of the General Assembly." Md. Const., art. XVI, § 2. The Senate passed the JJRA with the affirmative vote of 29 of its 47 members, or 61 percent of the chamber. The House enrolled the bill with 90 of its 141 members, totaling approximately 64 percent. Thus, with that level of support, the JJRA could have been passed as an emergency bill and made it effective immediately.

Effective on January 1, 2022, these Rules cover, among other things: the child's right to counsel "at every stage of all proceedings under this Chapter[,]" (Rule 11-404); taking a child into custody after the delinquency petition is filed (Rule 11-405); pre-adjudication placement into detention, community detention, or shelter care (Rule 11-406); jurisdiction waiver process (Rule 11-410); pre-adjudication studies by the Department of Juvenile Services (Rule 11-415); competency evaluations (Rule 11-416); emergency medical treatment of a child "who is already under the jurisdiction" of the juvenile court (Rule 11-417); motions practice (Rule 11-419); informal adjustments (Rule 11-420.1); the adjudicatory hearing (Rule 11-421); the disposition hearing (Rule 11-422); modifications or revisions to all orders of the delinquency court, including disposition orders (Rule 11-423); procedures and hearings for probation violations (Rule 11-424); and termination of the juvenile court's jurisdiction by court order (Rule 11-425).

Thus, when the General Assembly enacted the JJRA, it understood that in exercising its rulemaking authority just three months earlier, *this* Court deemed "a delinquency proceeding" to include *every* phase of a delinquency case, starting with the filing of the delinquency petition through and including all post-disposition matters.[20] Yet, based on the Majority's interpretation, a child placed in shelter care before an adjudication hearing under CJ § 3-8A-15(b) would, on June 1, 2022, lose the right to a hearing under CJ § 3-8A-15(d)

---

[20] Likewise, in section 11-503(a)(3) of the Criminal Procedure ("CP") Article, the General Assembly deemed post-disposition proceedings to be included within "a delinquency proceeding." CP § 11-503(a)(3) provides that: "In this section, 'subsequent proceeding' includes: . . . (3) in *a juvenile delinquency proceeding*, a review of a commitment order or other disposition under the Maryland Rules[.]" (Emphasis added.)

38

and Rule 11-406(e), leaving the child's status uncertain. It would also mean that a child subject to any disposition order would, on June 1, 2022, lose the right to seek a modification of such disposition because the juvenile court would no longer have jurisdiction. I do not believe the General Assembly intended such consequences.

For example, under the Majority's interpretation, on June 1, 2022, a child committed to the Maryland Department of Health for treatment in a mental hospital lost the right to future periodic progress reports and court reviews provided under CJ § 3-8A-19(j). And, for example, a child subject to a restitution order lost the right to later seek a reduction of the restitution obligation based on a post-disposition change in circumstances. Md. Rule 11-423(a) ("The court may modify or vacate an order if the court finds that action to be in the best interest of the respondent or the public."); *see also In re Darnell F.*, 71 Md. App. 584 (1987) (applying Rule 11-423's predecessor to motions to modify restitution orders).

In sum, the Majority's interpretation of subsection (d)(7) requires acceptance of the premise that when it enacted the JJRA, the General Assembly intended to divest the juvenile court of the jurisdiction to enter any post-disposition orders for children already in the system due to actions taken before their 13th birthday, including actions designed solely to benefit the child. Surely that is not what the General Assembly intended, yet that is where the Majority's logic takes us. If the juvenile court was divested of jurisdiction over "a delinquency proceeding," then the Majority's plain language approach would apply to *every* delinquency proceeding involving a nonviolent act by a child while under the age

39

of 13, at *any* stage.[21] In contrast, holding that the JJRA's jurisdictional changes did not apply to then-pending cases, as required by section 3-8A-07(a), *Parojinog*, and the general savings statute, yields no such problematic results.

***

For all these reasons, I would dismiss the appeal and remand the case to the juvenile court to proceed with the delinquency petition against M.P. On the merits, I would affirm the juvenile court's denial of the motion to dismiss.

Justice Biran has authorized me to state that he joins this opinion.

---

[21] The Majority recognizes this problem but declines to reason its way to a solution. In its conclusion, the Majority limits its holding to cases "pending adjudication of delinquency as of the effective date of the JJRA." Maj. Op. at 44. And in footnote 22, the Majority cautions that "[n]othing in [its] opinion should be interpreted as concluding that a juvenile court would lack jurisdiction with respect to a child under the age of 13 who had already been found delinquent at the time the JJRA took effect on June 1, 2022." That's an astonishing disclaimer: The Majority purports to interpret the plain language of CJ § 3-8A-07(d)(7) to the facts of *this* case; yet implies without explanation that the *same* plain language could take on a *different* meaning if the proceeding happens to be in the post-adjudication phase. There is no basis in the plain language of subsection (d)(7) or any other part of the JJRA for any such limitation.